## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JEFFREY SATTERFIELD, Individually and on Behalf of All Others Similarly Situated, | ) |
| | ) **Case No. 1:12-cv-05704** |
| | ) |
| Plaintiff, | ) Honorable Robert W. Gettleman |
| | ) |
| v. | ) Magistrate Judge Daniel G. Martin |
| | ) |
| LIME ENERGY CO., JOHN O'ROURKE and JEFFREY MISTARZ, | ) **CONSOLIDATED AMENDED** |
| | ) **CLASS ACTION COMPLAINT** |
| | ) |
| Defendants. | ) **JURY TRIAL DEMANDED** |
| _____ | ) |

Lead Plaintiffs Jamie Fang and Kevin J. Fetzer (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their undersigned attorneys, allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things: a review of wire and press releases published by and regarding Lime Energy Co. ("Lime Energy," "Lime," or the "Company"); Defendants' public statements, documents, conference calls and announcements; United States Securities and Exchange Commission ("SEC") filings; security analysts' reports and advisories about the Company; other publicly available information; and interviews with confidential witnesses.

### NATURE OF THE ACTION AND OVERVIEW

1.      This is a securities fraud class action brought on behalf of all persons who purchased or otherwise acquired Lime Energy's securities traded in the United States between May 14, 2008 and December 27, 2012, both dates inclusive (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated

thereunder against Lime Energy and certain of its senior management. This action arises from the material misrepresentations that Lime Energy, its current Chief Executive Officer and President John O'Rourke ("O'Rourke"), its current Chief Financial Officer Jeffrey Mistarz ("Mistarz"), and its former Chief Executive Officer and Chairman of the Board of Directors David R. Asplund ("Asplund") made about Lime Energy's financial statements, its internal controls and its ability to integrate acquired businesses.

2.      Lime Energy is a provider of clean energy solutions which include integrated energy engineering, consulting and implementation of solutions which purportedly enable its customers to reduce their facilities' energy consumption, lower their operating and maintenance costs and reduce their carbon footprint. The Company was formed in 2006 through 2008 from a series of acquisitions by Electric City Corp. of Illinois, which renamed itself and moved the Company's headquarters to Charlotte, North Carolina in 2011.

3.      The new Company struggled for profitability and needed to show increasing revenues and income to continue receiving funding to run the Company from investors. Thus, it launched a three-year strategic plan in 2010 under the direction of O'Rourke, who was charged with the responsibility of executing the plan, which was created by Lime's executive management and approved by its Board of Directors. This plan was intended to drive the Company's profitability and revenue by focusing and expanding its utility partnerships throughout the country.

4.      Lime Energy, however, was not equipped to execute the strategic plan and integrate the businesses that had been acquired when the new Company was formed. Defendants turned a blind eye in reckless disregard to the fact that Lime Energy did not have the accounting systems or internal controls in place which could consolidate the financials of the acquired entities and assure that its

financial statements were accurate. Indeed, during the Class Period, fictitious revenues were booked, which Defendants recklessly allowed to be reported in the Company's financials. Although the Company's financials could not be relied upon, Defendants nevertheless affirmatively misrepresented to the public that the Company was reaping "record earnings" and touted its "successful integration" and "synergies" with respect to its subsidiaries. All the while, Defendants knowingly or recklessly withheld from the investing public the truth about the Company's lack of controls over its accounting systems and inability to integrate financial information from the acquired companies. The record earnings Defendants represented to the market were, in fact, a chimera.

5. Thus, due to a lack of internal controls and an unwillingness to admit that its strategic plan to increase profitability and revenues was failing, the Company misreported revenues and income by creating fictitious revenue and booking revenue in earlier quarters than it was earned in order to make the Company appear more profitable than it actually was. Indeed, as the graphic below – used by Lime Energy to lure investors – shows, the Company repeatedly represented to the market that revenues were expanding at a record pace.



3

6.      As a result of Defendants' materially false and misleading statements, Lime Energy common stock traded at artificially inflated prices throughout the Class Period, reaching a Class Period high of $10.10 per share on May 14, 2008.

7.      As detailed herein, several Lime Energy employees raised concerns to Defendants regarding the misreporting of revenue, lack of internal controls with respect to accounting, and the financial errors that were being made. Nonetheless, even though these issues were well known to Lime Energy and the individual Defendants, the Company recklessly continued to publish materially false and misleading financial statements in violation of Generally Acceptable Accounting Principles ("GAAP"), the Company's own internal accounting standards, and the federal securities laws.

8.      The Defendants were motivated to issue materially false and misleading statements about the Company, *inter alia*, to continue receiving funding from investors including Richard Kiphart ("Kiphart") the Company's current Chairman of the Board of Directors, who had told Defendant O'Rourke during the Class Period that he would make much needed capital investments in Lime, but only if Lime Energy hit certain revenues and net profit numbers. During the Class Period, Kiphart advanced lines of credit to the Company and, along with other investors, acquired Lime Energy notes which helped fund the new Company's start up and expansion. To meet the demands of investors like Kiphart and prop up the price of the Company's stock, Defendants recklessly allowed false financials to be disseminated to the market from 2008 and proceeding throughout the Class Period. Indeed, Lime's finances were manipulated to make the Company appear more profitable than it actually was on a quarterly and year-end basis.

9.      The house of cards began to crumble when the Company was forced to make a partial disclosure that it would restate financial results for fiscal 2010 and 2011. On July 16, 2012, the

Company disclosed that the Audit Committee of the Board of Directors of Lime Energy had determined that the Company's consolidated financial statements filed with the SEC on Form 10-K for the periods ended December 31, 2010 and December 31, 2011, as well as the quarterly report on Form 10-Q for the period ended March 31, 2012, may no longer be relied upon.

10.     Specifically, the Company stated that, "[i]n some cases, it appears that non-existent revenue may have been recorded" and that "[i]n other cases, it appears that revenue may have been recorded earlier than it should have been." Additionally, Lime Energy indicated that the misreporting may potentially require restatement of its previously issued financial statements and that the Company, under the supervision of the Audit Committee and with the assistance of outside counsel, is conducting an investigation of the misreporting.

11.     On this news of this first disclosure, Lime Energy common stock fell $0.91 per share, or 44.83%, to close on July 17, 2012, at $1.12 per share, on unusually heavy volume.

12.     On December 27, 2012, the Company made a second disclosure detailing new information about the nature of its fraudulent activity.  The Company disclosed that the lack of internal controls which caused the 2010-2012 financials to be misstated as disclosed on July 17, 2012, actually existed for the 2008 and 2009 financials as well, and that Lime's consolidated financial statements reported in the Forms 10-K filed with the SEC for the years ended December 31, 2008 and December 31, 2009 (the "2008-2009 Financial Statements") may no longer be relied upon.  The Company specifically stated that "[t]he Company's management and the Audit Committee believe that some portion of the Company's revenue for 2009 and 2008 was recognized earlier than permitted under generally accepted accounting principles."   On the disclosure of this additional news, the price of Lime's common stock dropped another 7%.

13. By restating its financials, the Defendants have admitted that the representations made in the financial statements for the fiscal years 2008 through the first quarter of 2012 were false and misleading when made and, indeed, that the misrepresentations were material.

14. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements misrepresenting and/or failing to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with GAAP, and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

15. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages. Indeed, the Company's disclosures on July 16, 2012 and December 27, 2012, which resulted in the declines in the prices of Lime's common stock noted above, caused economic loss to the plaintiffs and all other members of the Class defined herein.

## JURISDICTION AND VENUE

16. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C.§§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

18.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Additionally, Defendant Lime Energy's principal executive offices were located within this Judicial District during the Class Period.

19.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

### Plaintiff

20.     Plaintiffs Jamie Fang and Kevin J. Fetzer, as set forth in their previously-filed certifications (Dkt. No. 22-3), incorporated by reference herein, purchased Lime Energy common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### Defendants

21.     Defendant Lime Energy is a Delaware corporation with its principal executive offices located at 16810 Kenton Drive, Suite 240, Huntersville, North Carolina 28078. Prior to August 2011, Lime Energy's principal executive offices were located at 1280 Landmeier Road, Elk Grove Village, Illinois 60007.

22.    Defendant John O'Rourke ("O'Rourke") was, at all relevant times, Lime Energy's Chief Operating Officer from 2009 to 2011 and has served as the Company's Chief Executive Officer ("CEO") since June 2011.   Defendant O'Rourke was, at all relevant times, a director of the Company since July 28, 2011.

23.    Defendant Jeffrey Mistarz ("Mistarz") was, at all relevant times, Chief Financial Officer ("CFO") of Lime Energy.  Defendant Mistarz was intimately involved in reviewing and approving the Company's financials prior to the final numbers being released to the public.  Managers were required to provide contract financial data to Mistarz, who reconciled revenue monthly and quarterly.

24.    Defendants O'Rourke and Mistarz are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Lime Energy's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  Further, Defendant Mistarz was charged with the responsibilities of reconciling revenue monthly and quarterly financials prior to them being reported to the public.  Moreover, Defendant O'Rourke was informed of the misreporting of revenues by certain employees during the Class

8

Period.

**Nominal Defendant**

25.     Nominal Defendant David R. Asplund ("Asplund") was Lime Energy's Chief Executive

Officer from 2006 through June 2011, and Lime Energy's Chairman of the Board of Directors

through June 2012.  Asplund was named as a defendant in the individual complaints filed in the

actions which have been consolidated with the instant action.  On January 4, 2013, Asplund filed a

voluntary petition for bankruptcy relief under Chapter 7 of Title 11 of the United States Code.

Accordingly, pursuant to 11 U.S.C. §362, this action currently is stayed against him individually.

## CLASS ACTION ALLEGATIONS

26.     Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure

23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Lime Energy's securities

between May 14, 2008 and December 27, 2012, both dates inclusive (the "Class Period"), who were

damaged thereby (the "Class").  Excluded from the Class are Defendants, officers and directors of

the Company at all relevant times, members of their families and their legal representatives, heirs,

successors or assigns and any entity in which Defendants have or had a controlling interest.

27.     The members of the Class are so numerous that joinder of all members is impracticable.

Throughout the Class Period, Lime Energy's securities were actively traded on the NASDAQ Stock

Exchange ("NASDAQ").  While the exact number of Class members is unknown to Plaintiff at this

time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are

hundreds or thousands of members in the proposed Class.  Millions of Lime Energy shares were

traded publicly during the Class Period on the NASDAQ.  As of March 1, 2012, the Company had

23,975,651 shares of common stock outstanding.  Record owners and other members of the Class

may be identified from records maintained by Lime Energy or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used in

securities class actions.

28.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the

Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is

complained of herein.

29.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has

retained counsel competent and experienced in class and securities litigation.

30.     Common questions of law and fact exist as to all members of the Class and predominate over

any questions solely affecting individual members of the Class.  Among the questions of law and

fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, financials, operations and management of Lime Energy;

- whether the Individual Defendants caused Lime Energy to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Lime Energy common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of the damages.

31.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

32.     The market for Lime Energy's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Lime Energy's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Lime Energy's securities and market information relating to Lime Energy, and have been damaged thereby.

33.     During the Class Period, the artificial inflation of Lime Energy's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Lime Energy's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Lime Energy and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company

11

stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

34.     At all relevant times, the market for Lime Energy's securities was an efficient market for the following reasons, among others:

- Lime Energy stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

- As a regulated issuer, Lime Energy filed periodic public reports with the SEC and/or the NASDAQ;

- Lime Energy regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

- Lime Energy was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

35.     As a result of the foregoing, the market for Lime Energy's securities promptly digested current information regarding Lime Energy from all publicly available sources and reflected such information in Lime Energy's stock price. Under these circumstances, all purchasers of Lime Energy's securities during the Class Period suffered similar injury through their purchase of Lime Energy's securities at artificially inflated prices and a presumption of reliance applies.

12

## SUBSTANTIVE ALLEGATIONS

### Background

36.     Lime Energy is purportedly a provider of clean energy solutions. The Company's services include integrated energy engineering, consulting and implementation of solutions which enable its customers to reduce their facilities' energy consumption, lower their operating and maintenance costs and reduce their carbon footprint.

37.     On February 25, 2008, Lime Energy's stock began trading on the NASDAQ Capital Market under the trading symbol "LIME." In June 2008, Lime acquired Applied Energy Management, Inc. ("AEM").  AEM provided energy engineering and consulting services and energy efficiency services similar to its existing energy efficiency lighting solutions.  During 2009, Lime Energy began serving utility services clients and in late 2009 it won its first contract to provide utility demand-side management services.

38.     During 2010, the Company established Lime Energy Asset Development, LLC ("LEAD"), to source, develop and operate renewable and alternative energy assets.  During 2011, Lime Energy implemented a corporate restructuring to better integrate and streamline its operations.  As part of this restructuring, it merged many of its subsidiaries, changed the name of Applied Energy Management, Inc., to Lime Energy Services Co. and moved its corporate headquarters to Huntersville, North Carolina.

39.     Contemporaneously, the Company began focusing its efforts in the utility division, which accounted for a huge portion of its profits and revenues during the Class Period.  Indeed, during the Class Period, Defendants repeatedly informed analysts about the size of the Company's backlog in its utility division as an indicator of future growth. Accordingly, it was all the more reckless of Defendants

13

not to assure that controls were in place to assure that accounting in this core operation of Lime Energy were not misstated.

40.     In addition, the Company continued to tout the growth of its utility division.  For example, in a May 25, 2010 press release, Lime Energy reports "that it has been awarded a competitively bid contract to implement the direct install component of New Jersey's Clean Energy Program, which is a national model for energy efficiency and renewable energy.  Under this contract, Lime Energy will operate exclusively in Bergen, Essex and Hudson counties, where the program is available to customers with a monthly electric demand not exceeding 200 kW.  The program provides customer incentives of up to 80% of the project cost for upgrades including energy efficient lighting, lighting controls, energy efficient motors, refrigeration, as well as heating, ventilation and air conditioning equipment.  As the direct install provider in northern New Jersey, Lime Energy will provide program marketing, project development and engineering, material procurement, database administration and turnkey project implementation.  The program is managed by TRC Energy Services, the market manager for New Jersey's Clean Energy commercial and industrial segment.  The direct install concept is designed to provide owners of small commercial and industrial buildings with a comprehensive package of cost-effective energy efficiency measures, resulting in energy savings not typically captured in these types of facilities.  The program provides owners with a seamless process for energy efficiency analysis and equipment replacement to reduce energy usage and save operating costs.  Based on the overall size of the statewide program,   Lime Energy estimates that it has the opportunity to provide more than 8 million kilowatt-hours of energy efficiency resources by delivering the program to several hundred customer facilities during the initial contract period which concludes at the end of 2010.   The potential revenue is estimated to be $3.7 million over this

period."

**Accounting Policies and Pracitices**

41.    Although GAAP unquestionably required Lime to book revenue in the period in which it was earned, it chose not to.  As a result, during the Class Period, Lime issued materially false and misleading statements regarding the Company's business and financial results.  Specifically, Defendants manipulated the recognition of revenues in violation of Statement of Financial Accounting Standards ("SFAS") 48, booking revenues in advance of when they were actually earned, and creating completely fictitious revenue, all the while concealing this from investors.

42.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in accordance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X also requires that interim financial statements comply with GAAP.  17 C.F.R. § 210.10-01 (a). GAAP, as described in Financial Accounting Standards Board ("FASB") Statement of Concepts No. 5 (FASB CON No. 5), provides the basic requirements for revenue to be recognizable: (i) revenue must have been earned; and (ii) revenue must be realizable (collectible).

43.    Along with FASB CON No. 5, the Company violated American Institute of Certified Public Accountants ("AICPA") Accounting Research Bulletin (ARB) No. 45, Long-Term Construction-Type Contracts  (which applies to almost all types of construction contracts including fixed-price or lump sum, cost-type, time and material, and unit price contracts) and AICPA Statement of Position ("SOP") 81-1, Accounting for Performance of Construction-Type and Certain Production-Type Contracts, which provides necessary guidance on applying GAAP not only for construction

15

contracts, but also for construction-like production activities. ARB No. 45 and SOP 81-1, mandate the use of either: (1) the *"percentage of completion"* method, under which which the construction contractor recognizes revenue over the life of the construction contract based on the degree of completion: 50% completion means recognition of one-half of revenues, costs, and income; or (2) the *"completed contract"* method, under which all revenues, costs, and income are recognized only at completion of the construction project, ordinarily at the end of the construction contract.

44.     Historically – and including part of the Class Period – Lime purported to recognize a portion of its revenue on a completed contract basis. During 2011, however, Lime purported to begin exclusively recognizing revenue for all its projects under the percentage of completion method. In fact, Lime failed to effectively deploy either method during the Class Period.

45.     The Company also violated SEC's Staff Accounting Bulletin No. 104, *Revenue Recognition*, which sets forth guidelines in the timing of revenue recognition based upon factors such as passage of title, installation, payments and client acceptance.

46.     In addition to GAAP and SEC standards, the Company violated its own, internal revenue recognition policies, which state as  follows:

> We recognize our revenue when all four of the following criteria are met: (i) persuasive evidence has been received that an arrangement exists; (ii) delivery of the products and/or services has occurred; (iii) the selling price is fixed or determinable; and (iv) collectability is reasonably assured. In addition, we follow the provisions of the SEC's Staff Accounting Bulletin No. 104, *Revenue Recognition*, which sets forth guidelines in the timing of revenue recognition based upon factors such as passage of title, installation, payments and client acceptance. Any amounts received prior to satisfying our revenue recognition criteria are recorded as billings in excess of costs and estimated earnings on uncompleted contracts.

47.     Moreover, Lime's *Code of Business Conduct and Ethics* specifies that:

> The Company's responsibilities to its shareholders and the investing public require that all transactions fully and accurately be recorded in the Company's books and

records in compliance with all applicable laws. **False or misleading entries, unrecorded funds or assets, or payments without appropriate supporting documentation and approval strictly are prohibited and violate Company policy and the law**. Additionally, all documentation supporting a transaction fully and accurately should describe the nature of the transaction and be processed and recordedin a timely fashion.

....

The federal securities laws require the Company to disclose certain information in various reports that the Company must file with or submit to the SEC. In addition, from time to time the Company makes other public communications, such as issuing press releases. The Company requires that its Chief Executive Officer, Chief Financial Officer and all other officers, directors and employees who are involved in the preparation of SEC reports or other public documents ensure that the information disclosed in those documents is full, fair, accurate, timely and understandable. **Moreover, if any such officer, director or employee becomes aware of any material information that he or she believes should be disclosed to the public in the Company's reports filed with the SEC, it is his or her responsibility to bring such information to the attention of the Chief Financial Officer or a member of the Audit Committee**. If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should report those concerns to a member of Senior Management or a member of the Audit Committee. [emphasis added.]

48. Finally, the Company's Audit Committee Charter itemizes the responsibilities of its

members, in relevant part, as follows:

• Meet with the independent auditors and management of the Company at the conclusion of the audit to review the results of the audit, including any comments or recommendations of the independent auditors, especially the contents of any auditors' letter to management.

• Review with the independent auditors and with the financial and accounting personnel the adequacy and effectiveness of the Company's internal controls and elicit any recommendations for improving the internal controls or particular areas where new or more detailed controls or procedures are desirable.

• Inquire of management and the independent auditors regarding significant risks or exposures and assess the steps management has taken to minimize such risks and exposures to the Company.

• Review the financial statements contained in the annual report to shareholders with management and the independent auditors and, if appropriate, recommend to the board that such financial statements be adopted for inclusion in the Corporation's annual report to stockholders.

• Inquire of the independent auditors regarding their qualitative judgments about the appropriateness, not just the acceptability, of the accounting principles and the clarity of the financial disclosures. Also inquire of the auditors regarding their reasoning in accepting or questioning management's significant estimates, changes or proposed changes in accounting principles and disclosure practices management employs for new transactions or events. Resolve disagreements between management and the independent auditors regarding financial statement disclosure.

• Investigate any matter brought to its attention within the scope of its duties, with the power to retain outside counsel for this purpose if, in its judgment, that is appropriate. The costs of such counsel will be paid by the Corporation.

• Verify that the Company's auditors have reviewed the Company's financial information prior to filing the Company's Form 10-Q Reports.

49.     The GAAP rules and Company-wide accounting policies violated in this case are not complex.  It is simple accounting that revenue cannot be recognized for unexecuted contracts and/or where there are significant obligations and/or contingencies relating to such contracts.  Yet, the Company, in the face of GAAP and its own publicly-acknowledged policy of not recognizing revenues from an arrangement until "persuasive evidence has been received that an arrangement exists" nevertheless recognized revenues from contracts before they were executed.  Lime, moreover, failed to apply "contract accounting" principles and "percentage of completion" methodology to arrangements in violation of Lime, moreover, failed to apply "contract accounting" principles and "completed contract" and/or "percentage of completion" methodology to arrangements, in violation of its own established accounting practices, as well as SOP 81-1.

50.     Revenue for projects, therefore, should have been recognized when the Company had a signed contract with a customer and when a materials invoice was posted for payment.  In its Form

10-K filed with the SEC for the years ending 2008-2009, Lime Energy stated:

**Revenue and Profit Recognition**

We recognize our revenue when all four of the following criteria are met: (i) persuasive evidence has been received that an arrangement exists; (ii) delivery of the products and/or services has occurred; (iii) the selling price is fixed or determinable; and (iv) collectability is reasonably assured. In addition, we follow the provisions of the SEC's Staff Accounting Bulletin No. 104, *Revenue Recognition*, which sets forth guidelines in the timing of revenue recognition based upon factors such as passage of title, installation, payments and client acceptance. Any amounts received prior to satisfying our revenue recognition criteria are recorded as Billings in Excess of Costs and Estimated Earnings on Uncompleted Contracts.

Historically, we have recognized revenue primarily on a completed contract basis. Under the completed contract method, revenue is recognized once the project is substantially complete, resulting in some variability in revenue. This method works well with projects that are smaller and shorter in duration. AEM, however, recognizes, and will continue to recognize, all of its revenue on a percentage of completion basis. AEM's projects generally are larger in terms of revenue and longer in duration; therefore, AEM recognizes revenue throughout the term of the project on a percentage of completion method based on the percentage of costs incurred. This accuracy of the estimates generated using this method is dependant on our ability to accurately estimate the remaining cost to complete the project. Because AEM represented approximately 54% of our 2008 revenue, we expect at least for the near future that the majority of our revenue will be recognized on a percentage of completion basis. Under both methods of revenue recognition, any anticipated losses on contracts are charged to operations as soon as they are determinable.

In its Form 10-K filed with the SEC for the year ending 2010, Lime Energy stated:

**Revenue and Profit Recognition**

We recognize our revenue when all four of the following criteria are met: (i) persuasive evidence has been received that an arrangement exists; (ii) delivery of the products and/or services has occurred; (iii) the selling price is fixed or determinable; and (iv) collectability is reasonably assured. In addition, we follow the provisions of the SEC's Staff Accounting Bulletin No. 104, Revenue Recognition, which sets forth guidelines in the timing of revenue recognition based upon factors such as passage of title, installation, payments and client acceptance. Any amounts received prior to satisfying our revenue recognition criteria are recorded as deferred revenue.

Historically, we have recognized revenue primarily on a completed contract basis. Under the completed contract method, revenue is recognized once the project

is substantially complete, resulting in some variability in revenue. This method works well with projects that are smaller and shorter in duration. Our public sector markets, however, recognize, and will continue to recognize, all of its revenue on a percentage of completion basis. Projects in our public sector market are generally larger in terms of revenue and longer in duration; therefore, we therefore recognize revenue throughout the term of the project on a completion method based on the percentage of costs incurred. Approximately half of our revenue is recognized on a percentage of completion basis. Under both methods of revenue recognition, any anticipated losses on contracts are charged to operations as soon as they are determinable.

In its Form 10-K filed with the SEC for the year ending 2011, Lime Energy stated:

### Revenue and Expense Components

*Revenue Recognition*

We recognize our revenue when all four of the following criteria are met: (i) persuasive evidence has been received that an arrangement exists; (ii) delivery of the products and/or services has occurred; (iii) the selling price is fixed or determinable; and (iv) collectability is reasonably assured. In addition, we follow the provisions of the SEC's Staff Accounting Bulletin No. 104, *Revenue Recognition*, which sets forth guidelines in the timing of revenue recognition based upon factors such as passage of title, installation, payments and client acceptance. Any amounts received prior to satisfying our revenue recognition criteria are recorded as billings in excess of costs and estimated earnings on uncompleted contracts.

We recognize the revenue utilizing the percentage of completion method of revenue recognition. Under the percentage of completion method we recognize revenue throughout the term of the project based on the percentage of costs incurred. Any anticipated losses on contracts are charged to operations as soon as they are determinable.

51.     Several Confidential Witnesses have provided evidence that not only did Lime Energy not

have any internal controls in place to ensure that the above standards were met, but that it was

commonly known within the Company, including Defendant Mistarz, that material errors were being

reported in the Company's financial statements. Revenue was continually booked in the wrong

quarters, booked to the wrong job, and in certain instances, booked fictitiously.

52.     Not only were these accounting errors taking place, but the most egregious behavior of

booking fictitious revenue occurred in the utilities division, which was the Company's most important division — *i.e.*, its core operations. Indeed, as disclosed in the Company's Form 10-K for the year ended December 31, 2011, the Company confirmed the importance of the utilities division:

> *Revenue Concentration*
>
> During 2011, one utility customer accounted for approximately 21% of our consolidated billings while a public utility commission, the Army Corps. of Engineers and an ESCO combined to account for an additional 33% of our consolidated billings. One utility customer accounted for approximately 17% of our consolidated billings during 2010, while two ESCO customers accounted for approximately 30% of the consolidated billings during 2009.
>
> We expect that contracts with large utilities or public utility commissions and ESCOs will continue to be a significant and growing source of revenue for us in the future, therefore we may experience greater client concentration in future periods than we have in the past.

### Confidential Witnesses

### Manipulated Revenues

53.     CW 1 was an accountant in Lime Energy's Woodbridge (New Jersey) office from May 2010 until approximately mid-November 2012.

54.     CW1 confirmed that from the time she became employed at Lime Energy in May 2010, Lime Energy's utilities division (which was its largest and most profitable division) had a practice of booking revenue on contracts that were not yet finalized. At Lime Energy, revenue for projects should have been recognized when the Company had a signed contract with a customer and when a materials invoice was posted for payment. Instead, the utilities division had recognized revenue improperly: contracts had not been signed by the customer; in the case of New Jersey Direct Installs, the contract was not signed by the utility company, which was required; a contract which was part of old audit proposal that the Company knew was not going to be approved by the customer; and some

21

contracts never existed in any capacity. CW 1 noticed these improper entries when she reconciled the books at the end of each month. In some instances, the Company had taken revenue for a contract three months earlier than it should have. In these instances, and when she learned that other contracts failed to materialize or did not exist, CW 1 had "to back the revenue out of the books." She did this by making the original revenue entry a negative number.

55.     According to CW 1, things weren't adding up. For example, the Solomon software system showed revenue booked in the fourth quarter of 2011 for a project that was originally proposed in 2009 which the customer had never signed. CW1 stated that "there was no real belief that the revenue was coming in," despite the revenue already having been booked in Lime Energy's financials.

56.     CW 1 recognized revenue for the utilities division solely based on numbers provided by the construction manager and program manager on a project. Only after the books were closed did CW 1 have time to check the accuracy of the revenue booked. When CW 1 conducted these reconciliations, CW 1 found numerous instances where the revenue reported in Solomon was not supported by the sales documents on the company's server. For example, CW 1 observed that Solomon showed revenue recognized for contracts that had not been signed or did not appear in the project folders as back up documents. Revenue reported in September 2011 was made negative revenue when CW 1 closed the books in October 2011. CW1 "always did the adjustment in an Excel spreadsheet [and] emailed it to (the controller), who loaded it into Solomon." The lack of controls concerned CW1 who noted that "they should have been auditing me."

57.     According to CW 1, her direct supervisor Jack Almeida, Vice President of Regional Energy Efficiency Operations, participated in a monthly conference call with O'Rourke, Mistarz and either

Adam Procell or Jeff Smith of Lime Energy's Senior Management Team to discuss the Company's utilities business.

58.     CW 1 stated that there was an internal report at Lime Energy called the "monthly cost to complete" that the controller sent to all upper management each month.  The monthly cost to completes, however, contained contracts that were dated after revenue had been booked, which was impossible under the Company's own standards, much less GAAP.  The monthly cost to completes also included contracts that did not exist.  CW 1 noted that any senior manager "could see the negative revenue if he looked at the reports job-by-job. By the end of the fourth quarter 2011, (the negative revenue) stuck out like a sore thumb."   As such, the "monthly cost to completes were inaccurate."

59.     At the end of each month, it was normal practice for project managers and construction managers for the utilities division to send their sales numbers to management. As part of CW 1's informal audit in preparation for reporting to the Senior Team Management, CW 1 found that the utilities division had been adding revenue through more jobs to the sales datasheets created by project managers and construction managers back to at least 2010.  The construction managers knew for months that their revenue was inflated "because the managers had been getting yelled at in corporate meetings about the backlog being off by the millions."

60.     Until the end of 2011, the backing out the misreported revenue by reversing the entries to negative numbers was ignored by management.  By the end of 2011, however, the negative numbers grew so large that the senior management could no longer ignore it.  At that time, CW1 reported to management that numbers were off by $9-$11 million.

61.     In 2011, CW 1 expressed her concerns to Defendant O'Rourke in person when he visited the

Woodbridge, New Jersey office. CW 1 told O'Rourke that the Company's "underbilled is increasing because contracts are not matching up." The underbilled item in the company's general ledger represented the revenue that CW 1 had to "back out" of the system because a contract did not close or never existed. CW 1 told Defendant O'Rourke that "the revenue was taken but not billed." Defendant O'Rourke responded to CW 1 that Defendant Mistarz told him that those types of discrepancies were standard with companies that are growing as fast as Lime Energy.

62.     The problem of revenue recognition problems was so obvious that CW 1's administrative assistant had identified a problem with the utility division's reported revenue in December 2011-January 2012. CW 1 reported the information up the chain of command, but was told that revenue was being misreported so that Lime Energy could hit certain revenues and net profits by the end of 2011 to satisfy investors such as Kiphart who told O'Rourke that he would make a capital investment in Lime Energy if the revenue numbers and net profits were met. "John O'Rourke definitely knew that revenue was being misreported."

63.     In the fall of 2012, Defendant O'Rourke held a video conference meeting, wherein he told CW1 and others in attendance that the misreported revenue(disclosed on July 17, 2012) was not a big deal and would boil down to a slap on the wrist. Nevertheless, O'Rourke advised CW 1 and the others "that we needed to keep our mouths shut or else the shareholders will sue us."

**Lack of Internal Controls**

64.     CW 2 was employed at Lime Energy as a senior accountant from June 2011 until April 2012. She reported directly to Julie Chandler, Lime's Controller. CW 2 explained that Lime Energy used a financial tracking system called Solomon. In mid-2011, Defendant Mistarz installed the system to integrate the financials of the nine companies that made up Lime Energy into four or five companies.

CW 2 stated that Lime Energy did not have an internal Information Technology employee to assist with the integration. Further, CW 2 stated that all attempts to hire an outside consultant utterly failed to merge the companies' data correctly. CW 2 stated that "there was an incredible lack of oversight in accounting."

65.     CW 2 stated that after the effort to consolidate financials began, errors occurred. Items were not categorized correctly and that "the data was not there post-acquisition." The financials for the various Lime Energy companies were supposed to be consolidated, but, according to CW 2, "when you looked at the books in the Solomon system, some accounts were in the billions" in terms of revenue, "which was not remotely accurate." The discrepancies were the result of data entry errors or mistakes due to lack of training and competence, and that there was no system in place to catch the errors. According to CW2, "it was very scary."

66.     CW 2 stated that Defendant Mistarz, along with only a few other employees at corporate headquarters had the ability to make journal entries in Solomon. The Solomon system, however, was not set up to identify which journal entries were made by which employees. Toward the end of her time at Lime Energy, CW 2 stated that she performed "all the reconciliations for cash, but they became impossible to do" because data was not being input to adequately process the reconciliations.

67.     The lack of internal controls was obvious to anyone who spent time with the Solomon system. For example, in February 2012, CW 2 discovered that a former employee had failed to enter accounts receivable payments into Solomon for some of Lime Energy's biggest clients and in other cases double-billed clients. The discovery was made when the Company started receiving large checks from some of Lime Energy's largest customers, including Honeywell, the U.S. Postal Service

("USPS") and Johnson Controls. The former employee had not indicated in the Solomon system that the invoices for these accounts had been sent to the aforementioned companies. The check amounts ranged from $270,000 to almost $600,000. CW2 stated that "there were no checks in place to catch these errors."

68.     In another instance, CW2 noted that an employee had gone back into the system to correct an invoice, but instead entered the invoice in a second-time, effectively double-billing the client. Even though the amounts were large, there was no routine checking for double billing. CW2 stated that it did not make sense for such an error to be caught so late in the process

69.     CW 2 took it upon herself to audit Lime Energy's transactions with USPS, Honeywell and Johnson Controls since they were the company's biggest customers, having accounts in the area of $6 or $7 million per customer. CW 2 tried to match the numbers in Solomon with the customer's records and found that they were off by millions of dollars off. CW 2 also found that the Company was failing to accurately track retention rates, which negatively impacted the Company's accounting because the amount of revenue expected never matched that amount of revenue received from customers.

70.     CW 2 also stated that Lime Energy had no method for backing up accruals, but instead only copied and pasted – as a journal entry into Solomon – an Excel spreadsheet of accrual costs that was drafted by CW 1. CW2 stated that the auditors "wanted CW1 to provide backup to prove the data because an error would be a material difference." Solomon lacked any back up documentation to confirm the accrual amounts, which were integral to providing the Company with a percentage of completion on projects. CW 2 recalled telling senior management that she could not confirm the numbers in the Solomon system as being accurate. CW 2 also recalled resistance within the

Company—from the warehouse employees to sales staff—to provide the supporting documentation for accrual costs.

71.      CW 2 stated that she relayed to the Controller and the Executive Vice President of Operations her concerns regarding the Company's financial controls and the errors that were occurring, but that changes in the lack of controls did not occur.

72.      According to CW 2, it was widely known in the Company that the Solomon system contained inaccurate financials. Indeed, she stated that "everyone knew. There was no financial plan and no GAAP analysis." Moreover, employees were unable to get accurate financial data to determine whether they were meeting budget expectations because the data was not in Solomon. O'Rourke and Mistarz also were aware of the accounting problems. As CW2 noted, "yes, they knew. They absolutely knew."

73.      CW 3, who reportedly had a degree in accounting, joined Lime Energy as a part-time accounts payable employee at Lime Energy's corporate headquarters in Huntersville, North Carolina in June 2011. CW 3 worked at Lime Energy until March 2012 entering vendor invoices into Solomon.

74.      CW 3 corroborates CW 2's testimony regarding difficulties faced in CW 2's attempts at reconciling Lime Energy's financial accounts. CW 3 recalled that when CW 2 joined the company in June 2011, the reconciliations were three or four months behind. There were complaints "about not being able to do reconciliations because information (in Solomon) was applied to the wrong accounts. The Company accountants did not have the information needed, there was something missing. The monthly reconciliations did not always match up." CW3 also corroborated CW 2's information regarding the billing and checks from large customers, and added that that accounting

27

entries were not verified by a second accounting employee, which was required under Sarbanes-Oxley.

75.     CW 4 was Vice President of the Midwest Region for Lime Energy from August 2006 to May 2011.  CW 4 worked at Lime Energy's corporate headquarters in Elk Grove, Illinois, and was in charge of the profit center revenue for the Midwest region. CW 4 stated that the Vice President of each individual profit center was responsible for financial figures provided to Defendant Mistarz, but the corporate accounting and consolidation of financials were handled exclusively by Defendant Mistarz. "Each area had somebody assigned to gather data for Defendant Mistarz, who oversaw and approved every aspect of the accounting and consolidation of financials." Mistarz reconciled revenue monthly and quarterly. "He had his eyes on whatever anyone reported.  Mistarz was a one man shop."

76.     CW 4 relayed that once a proposal to a client became a contract, information was entered into Salesforce, which was a reporting function used to monitor account executives and to track the progress of the contract.  Data entered into Salesforce included the following: customer information, contract value, and estimated start and end dates, status of job.  CW 4 relayed that standard contracts were paid in thirds: one-third upfront, one-third at 50% and one-third after completion.  CW 4 stated that revenue was not supposed to be booked until they had a signed contract.

**Materially False and Misleading**
**Statements Issued During the Class Period**

77.     The Class Period begins on May 14, 2008.  On this day, the Company issued a press release entitled "Lime Energy Co. Reports Results for Three-Month Period Ended March 31, 2008." Therein, the Company, in relevant part, stated:

**First Quarter 2008 Results:**

- Revenue for the first quarter of 2008 increased 15% to $2,907,479 from $2,528,547 for the first quarter of 2007 on higher sales from our Energy Services business.

- Gross profit for the first quarter of 2008 was $149,078 as compared to $372,067 for the first quarter of 2007.

- Operating loss increased $548,668 to $3,889,321 during the first quarter of 2008 from $3,340,653 during the first quarter of 2007.

- Net loss increased $922,434 during the first quarter of 2008 to $4,233,373 from 3,310,939 during the first quarter of 2007.

- Basic and diluted loss of $0.55 per share for the first quarter of 2008 as compared to a loss of $0.46 per share for the first quarter of 2007.

- Adjusted EBITDA loss increased $549,512 to $2,620,195 from $2,070,683 for the first quarter of 2007.

78.     Then CEO Asplund, commenting on the results, stated, in pertinent part, as follows:

Our first quarter financial results were consistent with our expectations for the period while at the same time we believe that new projects are in line to deliver the levels of growth we discussed during our 2007 year end reporting … Over 75% of our revenue for the quarter came from our Energy Services segment where revenue increased approximately 30% over Q1 of 2007. Given that our revenues are highly seasonal, we fully expected our results to be lowest this period but then to begin to increase quarter-over-quarter and peak in the fourth quarter where we anticipate our 2008 annual growth to mirror 2007 vs. 2006.

79.     On May 14, 2008, Lime Energy filed its Quarterly Report on Form 10 Q (the "Q1 2008 10-Q") with the SEC for the 2008 fiscal first quarter.  The Q1 2008 10-Q was signed by Asplund and Mistarz, and reaffirmed the Company's financial results announced that same day.  The Q1 2008 10-Q also contained Sarbanes-Oxley required certifications, signed by Asplund and Mistarz, who certified:

1.     I have reviewed this quarterly report on Form 10-Q of Lime Energy Co. (the "Registrant"):

29

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods present in this report;

4.      Registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13-a-15(f) and 15d-15(f)) for the registrant and have:

   a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)      Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)      Disclosed in this report any change in the Registrant's internal control over financing reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.      The Registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the Audit Committee of the Registrant's Board of Directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involved management or other employees who have a significant role in the Registrant's internal control over financial reporting.

80.    The Q1 2008 10-Q stated that:

Our management, including our chief executive officer and our chief financial officer, maintains our 'disclosure controls and procedures' (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the 'Exchange Act')) and has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report.  Based on such evaluation, our chief executive officer and chief financial officer have concluded that, as of March 31, 2008, such disclosure controls and procedures are effective for the purpose of ensuring that material information required to be in the reports that we submit, file, furnish or otherwise provide to the Securities and Exchange Commission is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

81.    The Q 1 2008 10-Q also stated that "[t]here have not been any changes in our internal control

over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the quarter

ended March 31, 2008 that have materially affected or are reasonably likely to materially affect our

internal control over financial reporting."

82.    The statements Defendants made in the Q1 2008 10-Q as specified in Paragraphs 77 to 81

above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly

recording revenue, including the creation of fictitious revenue and booking revenue in the wrong

period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

83.     On August 15, 2008, the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month and Six-Month Periods Ended June 30, 2008." Therein, the Company, in relevant part, stated:

**Results for the three-month period ended June 30, 2008:**

- Revenue for the second quarter of 2008 increased 69% to $6,933,769 from $4,102,693 for the second quarter of 2007 on higher sales from our Energy Efficiency Services business.

- Gross profit of $909,326 for the second quarter of 2008 as compared to $1,157,969 for the second quarter of 2007.

- Operating loss of $4,005,603 for the second quarter of 2008 as compared to an operating loss of $1,971,924 for the second quarter of 2007.

- Net loss of $4,530,589 for the second quarter of 2008 as compared to a net loss of $2,043,553 during the second quarter of 2007.

- Basic and diluted loss of $0.57 per share for the second quarter of 2008 as compared to a loss of $0.27 per share for the second quarter of 2007.

- Adjusted EBITDA loss of $2,514,336 for the second quarter of 2008 as compared to a loss of $746,149 for the second quarter of 2007.

**Results for six-month period ended June 30, 2008:**

- Revenue for the first half of 2008 increased 48% to $9,841,248 from $6,631,240 for the first half of 2007 on higher sales from our Energy

Efficiency Services business.

- Gross profit for the first half of 2008 was $1,058,404 as compared to $1,530,036 for the first half of 2007.

- Operating loss of $7,894,924 for the first half of 2008 as compared to an operating loss of $5,312,578 for the first half of 2007.

- Net loss of $8,763,962 for the first half of 2008 as compared to an operating loss of $5,354,492 for the first half of 2007.

- Basic and diluted loss of $1.12 per share for the first half of 2008 as compared to a loss of $0.72 per share for the first half of 2007.

- Adjusted EBITDA loss of $5,134,531 for the first half of 2008 as compared to a loss of $2,816,833 for the first half of 2007.

84.     Asplund, commenting on the results, stated, in pertinent part, as follows:

Over the last two years, we have invested a substantial amount of money in building up Lime Energy which we believe has resulted in its becoming a formidable force in the energy efficiency marketplace. With the addition of AEM, we now provide a diversified array of energy efficiency services and technologies to commercial and industrial companies, energy service companies and utilities on a truly national platform. We expect these investments to result in improved financial performance through the rest of this year and into 2009…

85.     On August 15, 2008, Lime Energy filed its Quarterly Report on Form 10-Q (the "Q2 2008 10-Q") with the SEC for the 2008 fiscal second quarter. The Q2 2008 10-Q was signed by Asplund and Mistarz, and reaffirmed the Company's financial results announced that same day. The Q2 2008 10-Q also contained Sarbanes-Oxley required certifications, signed by Asplund and Mistarz, substantially similar to the certifications contained in Paragraph 79, *supra*.

86.     The Q2 2008 10-Q also stated that the Company's internal controls and disclosure procedures were effective as stated in Paragraphs 80 to 81, *supra*.

87.     The statements Defendants made in the Q2 2008 10-Q as specified in Paragraphs 83 to 86 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly

33

recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

88.     On November 14, 2008, the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month and Nine-Month Periods Ended September 30, 2008." Therein, the Company, in relevant part, stated:

**Results for the three-month period ended September 30, 2008:**

- Revenue for the third quarter of 2008 increased $12,870,989, or $236%, to $18,332,079 from $5,461,090 for the third quarter of 2007 on higher sales from our Energy Efficiency Services business.

- Gross profit for the third quarter of 2008 increased $3,093,996, or 216%, to $4,528,431 as compared to $1,434,435 for the third quarter of 2007.

- Selling, general and administrative expenses as a percentage of revenue declined from 54.3% during the third quarter of 2007 to 32.7% during the third quarter of 2008.

- Adjusted EBITDA loss declined 45% to $418,313 for the three-month period ended September 30, 2008 as compared to a loss of $758,723 for the same period in 2007.

- Operating loss declined 2% to $2,207,008 for the third quarter of 2008 as compared to an operating loss of $2,245,411 for the third quarter of 2007.

- Net loss of $3,138,703 increased 22% for the third quarter of 2008 as compared to a net loss of $2,565,425 for the third quarter of 2007.

- Basic and diluted loss increased 8% to $0.36 per share for the third quarter of

2008 as compared to a loss of $0.33 per share for the third quarter of 2007.

89.     Defendants Lime Energy and Asplund, commenting on the results, stated, in pertinent part, as follows:

> The company is increasing its revenue guidance for the second half 2008 to between $45 million and $50 million from between $40 million and $45 million. Given third quarter results, the fourth quarter revenue estimate is therefore in a range of $27 million and $32 million with positive adjusted EBITDA.

> Although we are very cognizant of the current difficult economic environment, we are comfortable increasing our revenue estimate at this time … To date, we have not yet seen a slow down in our business with commercial or industrial customers and continue to bid, propose, develop and close new projects.

90.     On November 14, 2008, Lime Energy filed its Quarterly Report on Form 10-Q (the "Q3 2008 10-Q") with the SEC for the 2008 fiscal third quarter.  The Q2 2008 10-Q was signed by Asplund and Mistarz, and reaffirmed the Company's financial results announced that same day.  The Q2 2008 10-Q also contained Sarbanes-Oxley required certifications, signed by Asplund and Mistarz, substantially similar to the certifications contained in Paragraph 79, *supra*.

91.     The Q3 2008 10-Q also stated that the Company's internal controls and disclosure procedures were effective as stated in Paragraphs 80 to 81, *supra*.

92.     The statements Defendants made in the Q3 2008 10-Q as specified in Paragraphs 88 to 91 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate

35

internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

93.     On March 10, 2009, the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month and Twelve-Month Periods Ended December 31, 2008." Therein, the Company, in relevant part, stated:

**Results for the three-month period ended December 31, 2008:**

- Revenue for the fourth quarter of 2008 increased $21,659,797 or 293% to $29,048,597 from $7,388,800 in the fourth quarter of 2007.

- Gross profit increased $5,017,728 or 350% during the fourth quarter of 2008 $6,451,987 compared to $1,434,259 in the fourth quarter of 2007.

- Adjusted EBITDA income of $1,431,563 during the fourth quarter of 2008 compared to a loss of $1,182,799 during the fourth quarter of 2007.

- Selling, General and Administrative expenses declined to 20.1% of revenue during the fourth quarter of 2008 from 56.9% of revenue during the third quarter of 2007.

- Operating loss $342,478 during the fourth quarter of 2008 compared to an operating loss of $7,309,510 during the same period of 2007.

- Net loss available to common stockholders of $1,420,875 during the fourth quarter of 2008 compared to a loss of $7,632,812 during the fourth quarter of 2007.

- Basic and diluted loss of $0.16 per share for the fourth quarter of 2008 as compared to $0.99 per share for 2007.

**Results for the twelve-month period ended December 31, 2008:**

- Revenue for 2008 increased $37,740,794, or 194%, to $57,221,924 as compared to $19,481,130 for 2007.

- Gross profit increased $7,640,092 or 174%, to $12,038,822 from $4,398,730 for 2007.

- Adjusted EBITDA loss declined 13% to $4,121,281 in 2008 from $4,758,354 for 2006.

- Selling, General and Administrative expense were 35.6% of revenue during 2008 as compared to 67.1% of revenue during 2007.

- The operating loss declined 30% to $10,444,410 for 2008, from $14,867,498 for 2007.

- Net loss available to common stockholders of $13,323,540 compared to $15,552,728 for 2007.

- Basic and diluted loss of $1.59 per share for 2008 as compared to $2.06 per share for 2007.

94.     Asplund, commenting on the results, stated, in pertinent part, as follows:

We are extremely pleased to report record revenues and the first quarter in our history with positive adjusted EBITDA … This marks another key milestone achieved as we work to build Lime Energy into the leading energy efficiency and renewable energy solutions provider in the country. In spite of an increasingly difficult economic environment, we continued to build upon our platform by hiring and training new employees, achieved a 194% increase in revenue for the year and continued to increase and diversify our customer base and our energy efficiency solution offerings.

95.     On March 11, 2009, Lime Energy filed its Annual Report on Form 10-K (the "2008 10-K") with the SEC for the 2008 fiscal year.  The 2008 10-K was signed by Asplund and Mistarz, and reaffirmed the Company's financial results announced that same day.   The 2008 10-K also contained Sarbanes-Oxley required certifications, signed by Asplund and Mistarz, substantially similar to the certifications contained in Paragraph 79, *supra*.

96.     The 2008 10-K stated that:

Our management carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on the evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2008, our disclosure controls and procedures were effective.

97.     The 2008 10-K also stated that:

As of the end of the period covered by this report, our management carried out an

37

evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our internal control over financial reporting. In carrying out its evaluation, our management used the criteria set forth in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ('COSO'). Based on its assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2008.

98.     The 2008 10-K further stated as follows: "There were no changes in our internal control over financial reporting during the quarter ended December 31, 2008 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

99.     The statements Defendants made in the 2008 10-K as specified in Paragraphs 93 to 98 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

100.    On May 12, 2009, the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month Period Ended March 31, 2009." Therein, the Company, in relevant part, stated:

**Results for the three-month period ended March 31, 2009:**

- Revenue of $13,724,758, an $11,477,922 or 511% increase when compared to the historical results for the first quarter of 2008 and a $5,118,445 or 60% increase over the pro forma results for the first quarter of 2008, assuming the acquisition of AEM had occurred on January 1, 2008.

- Gross profit of $2,804,836 a $2,771,255 increase over the $33,581 earned in the prior year and $1,501,719 or 115% increase over the first quarter 2008 pro forma gross profit.

- Gross profit margin of 20.4% as compared to 1.5% earned during the first quarter of 2008 and 15.1% earned during the first quarter of 2008 on a pro forma basis.

- Adjusted EBITDA loss of $2,087,472, a $536,959 or 20.5% reduction from the loss of $2,624,431 recorded during the first quarter of 2008 and a $1,362,229 or 39.5% improvement from the pro forma loss of $3,429,617.

- Selling, General and Administrative expense increased 1.8% from the pro forma expense for the first quarter of 2008.

- Loss from continuing operations of $3,215,974 an improvement of $187,031 or 5.5% from the loss of $3,403,005 for the first quarter of 2008 and a $1,963,802 or 37.9% improvement from the loss of $5,179,776 for the first quarter 2008 on a pro forma basis.

- Loss from discontinued operations of $392,329, a $438,039 or 52.8% reduction from the $830,368 reported for the first quarter of 2008.

- Net loss available to common stockholders of $4,164,092 compared to a loss of $4,233,373 for the first quarter of 2008 and a loss of $6,010,144 on a pro forma basis.

- Basic and diluted loss per common share from continuing operations of $0.34 as compared to $0.44 per share for the first quarter of 2008 and $0.60 per share on a pro forma basis.

- Basic and diluted loss per common share of $0.38 per share versus a loss of $0.55 per share for the first quarter of 2008 and $0.69 per share pro forma.

101.    Asplund, commenting on the results, stated, in pertinent part, as follows:

The first quarter marked another record quarter of performance for Lime Energy, with revenue up 60% from the first quarter of 2008 on a pro forma basis …This increase was across our customer base with sales to commercial and industrial customers more than doubling and revenue from federal, state and local governments through our ESCO partners increasing by more than 40%. In addition to top-line growth, we continued to see strong operating leverage over first quarter 2008 on a

39

pro forma basis with gross margins increasing by over 30% while SG&A increased only 1.8% resulting in a 40% improvement in our quarterly adjusted EBITDA loss.

102.    On May 12, 2009, Lime Energy filed its Quarterly Report on Form 10-Q (the "Q1 2009 10-Q") with the SEC for the 2010 fiscal first quarter. The Q1 2009 10-Q was signed by Asplund and Mistarz, and reaffirmed the Company's financial results announced that same day. The Q1 2009 10-Q also contained Sarbanes-Oxley required certifications, signed by Asplund and Mistarz, substantially similar to the certifications contained in Paragraph 79, *supra*.

103.    The Q1 2009 10-Q also stated that the Company's internal controls and disclosure procedures were effective as stated in similar to Paragraphs 80 to 81, *supra*.

104.    The statements Defendants made in the Q1 2009 10-Q as specified in Paragraphs 100 to 103 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

105.    On August 12, 2009, the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month and Six-Month Periods Ended June 30, 2009." Therein, the Company, in relevant part, stated:

**Results for the three-month period ended June 30, 2009**

- Revenue increased $9,417,279 or 147.7%, to $15,795,187 for the three-month period ended June 30, 2009 from $6,377,908 for the same period in 2008. Revenue increased $5,640,084 or 55.5% over second quarter 2008 pro forma revenue of $10,155,103, assuming the acquisition of Applied Energy Management, Inc. had taken place on January 1, 2008.

- Gross profit increased $1,939,232 or 214.7% to $2,842,383 during the second quarter of 2009 compared to $903,151 for the second quarter of 2008. Gross profit increased $1,473,309 or 107.6% when compared to the 2008 second quarter pro forma gross profit of $1,369,074. The gross margin for the second quarter of 2008 was 18.0% compared to 14.2% for the second quarter of 2008 on a historical basis and 13.5% on a pro forma basis.

- Selling, general and administrative expense increased $1,717,843 or 44.8% to $5,549,345 during the three-month period ended June 30, 2009 compared to $3,831,502 for the same period in 2008. SG&A expense declined $336,863 or 5.7% when compared to the three-month period ended June 30, 2008 on a pro forma basis.

- The loss from discontinued operations decreased $169,367 or 21.0% to $636,895 for the second quarter of 2009 from $806,262 during the second quarter of 2008. The 2009 loss from discontinued operations includes a $503,407 impairment charge related to the reduction in certain assets to be sold to their fair value.

- Adjusted EBITDA loss declined $291,411 or 11.6% to $2,226,750 during the three-month period ended June 30, 2009 from $2,518,161 in the year earlier period. The Adjusted EBITDA loss declined $2,158,729 or 49.2% when compared to the 2008 pro forma three-month period ended June 30, 2008.

- The second quarter net loss declined $476,828 or 10.5% to $4,053,589 compared to $4,530,589 for the second quarter of 2008. The net loss declined $2,723,882 or 40.2% when compared to the second quarter of 2008 on a pro forma basis.

- The basic and diluted net loss per share for the second quarter of 2009 declined $0.23 or 38.6% to $0.36 per share from $0.59 per share for the second quarter of 2008. The basic and diluted loss per share declined $0.42 per share or 53.8% when compared 2008 second quarter loss of $0.78 per share a pro forma basis.

**Results for the six-month period ended June 30, 2009**

- Revenue increased $20,895,201 or 242.3%, to $29,519,945 for the six-month period ended June 30, 2009 compared to $8,624,744 for the six-month period ended June 30, 2008. Revenue increased $10,758,529 or 57.3% compared to pro

forma revenue for the second quarter of 2008 of $18,761,416, assuming the acquisition of Applied Energy Management, Inc. had taken place on January 1, 2008.

- Gross profit increased $4,710,487 or 502.9%, to $5,647,219 for the six months ended June 30, 2009 compared to $936,732 for the six months ended June 30, 2008. Gross profit increased $2,975,028 or 111.3% when compared to the gross profit for the six months ended June 30, 2008 on a pro forma basis.

- Selling, General and Administrative expense increased $3,960,561 or 58.1%, to $10,781,982 for the six-month period ended June 30, 2009 compared to $6,821,421 for the same period in 2008. SG&A expense declined $245,407 or 2.2%, when compared to SG&A expense for the six months ended June 30, 2008 on a pro forma basis of $11,027,389.

- Adjusted EBITDA loss declined $828,370 or 16.1%, to $4,314,222 for the first six months of 2009 compared to $5,142,592 for the same period in 2008. The Adjusted EBITDA loss declined $3,520,958 or 44.9%, when compared to the six-month period ended June 30, 2008 on a pro forma basis.

- Net loss declined $1,101,900 or 12.6% to $7,662,062 during the first six months of 2009 compared to $8,763,962 for the same period in 2008. The net loss declined $5,168,225 or 40.3%, when compared to the net loss for the six-month period ended June 30, 2008 on a pro forma basis.

- The basic and diluted loss per share declined $0.38 or 34.2%, to a loss of $0.74 per share for the six-month period ended June 30, 2009 compared to a loss of $1.12 per share for the same period in 2008. The basic and diluted loss per share declined $0.74, or 50.2% when compared to the basic and diluted loss per share of $1.48 for the first six months of 2008 on a pro forma basis.

106.    Asplund, commenting on the results, stated, in pertinent part, as follows:

The second quarter marked another strong quarter of growth for Lime Energy … Organic revenue was up 55% from the second quarter of 2008 on a pro forma basis which was particularly notable given a roughly 10% decline in revenue with our commercial and industrial customers due to the continued difficult economic environment but an almost 100% increase in revenue from the public sector which includes our ESCO partners working with federal, state and local entities. In addition to further top-line growth, we continued showing operating leverage over second quarter 2008 on a pro forma basis with gross margins increasing by 33% while SG&A decreased 5.7%, resulting in a 49% improvement in our quarterly adjusted EBITDA loss over the pro forma results from the second quarter in 2008.

107.     On August 12, 2009, Lime Energy filed its Quarterly Report on Form 10-Q (the "Q2 2009 10-Q") with the SEC for the 2009 fiscal second quarter.  The Q2 2009 10-Q was signed by Asplund and Mistarz, and reaffirmed the Company's financial results announced that same day.  The Q2 2009 10-Q also contained Sarbanes-Oxley required certifications, signed by Asplund and Mistarz, substantially similar to the certifications contained in Paragraph 79, *supra*.

108.     The Q2 2009 10-Q also stated that the Company's internal controls and disclosure procedures were effective as stated in Paragraphs 80 to 81, *supra*.

109.     The statements Defendants made in the Q2 2009 10-Q as specified in Paragraphs 105 to 108 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

110.     On November 12, 2009, the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month and Nine-Month Periods Ended September 30, 2009."  Therein, the Company, in relevant part, stated:

**Results for the three-month period ended September 30, 2009**

- Revenue increased $3.3 million or 18.6%, to $21.003 million for the three-month period ended September 30, 2009 from $17.709 million for the same period in 2008.

43

- Gross profit increased $158 thousand or 3.6% to $4.479 million during the third quarter of 2009 compared to $4.321 million for the third quarter of 2008. The gross margin for the third quarter of 2009 was 21.3% compared to 24.4% for the third quarter of 2008.

- Selling, general and administrative expense increased $222 thousand or 4.0% to $5.731 million during the three-month period ended September 30, 2009 compared to $5.509 million for the same period in 2008.

- The operating loss declined 15% or $269 thousand to $1.521 million during the third quarter of 2009 from $1.79 million in the year earlier period.

- The loss from discontinued operations decreased $22 thousand or 5.3% to $396 thousand for the third quarter of 2009 from $418 thousand for the third quarter of 2008.

- Adjusted EBITDA loss increased $658 thousand to $697 thousand during the three-month period ended September 30, 2009 from $39 thousand in the year earlier period.

- The third quarter net loss increased $752 thousand or 24.0% to $3.891 million compared to $3.139 million for the third quarter of 2008.

- The basic and diluted net loss per share for the third quarter of 2009 declined $0.10 or 27.8% to $0.26 per share from $0.36 per share for the third quarter of 2008.

**Results for the nine-month period ended September 30, 2009**

- Revenue increased $24.189 million or 91.9%, to $50.523 million for the nine-month period ended September 30, 2009 compared to $26.334 million for the nine-month period ended September 30, 2008. Revenue increased $14.052 million or 38.5% compared to pro forma revenue for the nine-month period ended September 30, 2008 of $36.471 million, assuming the acquisition of Applied Energy Management, Inc. had taken place on January 1, 2008.

- Gross profit increased $4.867 million or 92.5%, to $10.126 million for the nine months ended September 30, 2009 compared to $5.529 million for the nine months ended September 30, 2008. Gross profit increased $3.131 million or 44.8% when compared to the gross profit for the nine months ended September 30, 2008 on a pro forma basis.

44

- Selling, General and Administrative expense increased $4.182 million or 33.9%, to $16.513 million for the nine-month period ended September 30, 2009 compared to $12.331 million for the same period in 2008. SG&A expense declined $24 thousand or 0.1%, when compared to SG&A expense for the nine months ended September 30, 2008 on a pro forma basis of $16.537 million.

- Adjusted EBITDA loss increased $986 thousand or 28.1%, to $4.493 million for the first nine months of 2009 compared to $3.507 million for the same period in 2008. The Adjusted EBITDA loss declined $1.484 million or 24.8%, when compared to a loss of $5.977 million for the nine-month period ended September 30, 2008 on a pro forma basis.

- Net loss declined $349 thousand or 2.9% to $11.554 million during the first nine months of 2009 compared to $11.903 million for the same period in 2008. The net loss declined $4.415 million or 27.6%, when compared to the net loss for the nine-month period ended September 30, 2008 on a pro forma basis.

- The basic and diluted loss per share declined $0.48 or 32.9%, to a loss of $0.98 per share for the nine-month period ended September 30, 2009 compared to a loss of $1.46 per share for the same period in 2008. The basic and diluted loss per share declined $0.86, or 46.7% when compared to the basic and diluted loss per share of $1.84 for the first nine months of 2008 on a pro forma basis.

111.  Asplund, commenting on the results, stated, in pertinent part, as follows:

The third quarter marked another strong quarter of growth for Lime Energy … We continued to grow revenue, show improved operating leverage and support new initiatives in engineering, utility program management and direct federal government contracting despite the continued challenging economic environment. Results were in line with expectations, with consolidated revenue up over 18% from the third quarter of 2008. Contributing to the increase was a 24% increase in revenue from our commercial and industrial (C&I) business and a 16% increase in our public sector work with our ESCO partners.

112.  On November 12, 2009, Lime Energy filed its Quarterly Report on Form 10-Q (the "Q3 2009 10-Q") with the SEC for the 2009 fiscal third quarter. The Q3 2009 10-Q was signed by Asplund and Mistarz, and reaffirmed the Company's financial results announced that same day. The Q3 2009 10-Q also contained Sarbanes-Oxley required certifications, signed by Asplund and Mistarz, substantially similar to the certifications contained in Paragraph 79, *supra*.

45

113.    The Q3 2009 10-Q also stated that the Company's internal controls and disclosure procedures were effective through language substantially similar to Paragraphs 80 to 81, *supra*.

114.    The statements Defendants made in the Q3 2009 10-Q as specified in Paragraphs 110 to 113 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

115.    On February 23, 2010, Asplund participated in the Piper Jaffray Clean Technology & Renewables Conference, at which time he made statements touting the Company's purported "significant full year revenue growth" while emphasizing the Company's "need to get profitable."

116.    On March 23, 2010, the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month and Twelve-Month Periods Ended December 31, 2009." Therein, the Company, in relevant part, stated:

**Results for the three-month period ended December 31, 2009**

- Revenue declined $8.3 million or 29.2%, to $20.3 million for the three-month period ended December 31, 2009, from $28.6 million for the same period in 2008.

- Gross profit decreased $2.9 million or 45.9% to $3.5 million during the fourth quarter of 2009 compared to $6.4 million for the fourth quarter of 2008. The gross margin for the fourth quarter of 2009 was 17.2% compared to 22.5% for the fourth quarter of 2008.

46

- Selling, general and administrative expense increased $1.6 million or 28.7% to $7.4 million during the three-month period ended December 31, 2009 compared to $5.8 million for the same period in 2008. This increase was primarily due to investments in new initiatives that are expected to be significant contributors to 2010 results.

- The loss from continuing operations increased $6.4 million to $7.1 million during the fourth quarter of 2009 from $707,000 in the year earlier period. The fourth quarter 2009 loss from continuing operations included a one-time non-cash charge of $2.7 million related to the write-off the trade name associated with a prior acquisition and a $300,000 reserve for a legal settlement.

- The loss from discontinued operations decreased $64,000 or 15.1% to $361,000 for the fourth quarter of 2009 from $425,000 for the fourth quarter of 2008.

- The fourth quarter net loss increased $5.4 million to $6.5 million compared to $1.1 million for the fourth quarter of 2008.

- The basic and diluted net loss per share from continuing operations for the fourth quarter of 2009 increased $0.15 to $0.26 per share from $0.11 per share for the fourth quarter of 2008.

- Adjusted EBITDA loss increased $5.2 million to $3.3 million during the three-month period ended December 31, 2009 from income of $1.9 million in the year earlier period.

**Results for the twelve-month period ended December 31, 2009**

- Revenue increased $15.8 million or 28.8%, to $70.8 million for the twelve-month period ended December 31, 2009 compared to $55.0 million for the twelve-month period ended December 31, 2008. Revenue increased $5.7 million or 8.7% compared to pro forma revenue for the twelve-month period ended December 31, 2008 of $65.1 million, assuming the acquisition of Applied Energy Management, Inc. had taken place on January 1, 2008.

- Gross profit increased $1.9 million or 16.4%, to $13.6 million for the twelve months ended December 31, 2009 compared to $11.7 million for the twelve months ended December 31, 2008. Gross profit increased $180 thousand or 1.3% when compared to the gross profit for the twelve months ended December 31, 2008 on a pro forma basis.

47

- Selling, General and Administrative expense increased $5.8 million or 32.3%, to $23.9 million for the twelve-month period ended December 31, 2009 compared to $18.1 million for the same period in 2008. SG&A expense increased $1.6 million or 7.3%, when compared to SG&A expense for the twelve months ended December 31, 2008 on a pro forma basis of $22.3 million.

- The loss from continuing operations increased $6.7 million or 63.7%, to $17.3 million in 2009, from $10.6 million in 2008. The loss from continuing operations increased $2.9 million, or 20.0%, from $14.4 million on a pro-forma basis. The 2009 results included a one-time non-cash charge of $2.7 million related to the write-off the trade name associated with a prior acquisition and a $300,000 reserve for a legal settlement.

- The loss from discontinued operations declined $694,000 to $1.8 million in 2009, from $2.5 million in 2008.

- Net loss increased $5.0 million or 38.3%, to $18.0 million during the first twelve months of 2009, compared to $13.0 million for the same period in 2008. The net loss increased $1.1 million or 6.8%, when compared to the net loss for the twelve-month period ended December 31, 2008 on a pro forma basis.

- The basic and diluted loss per share from continuing operations declined $0.17 to a loss of $1.12 per share for the twelve-month period ended December 31, 2009 compared to a loss of $1.29 per share for the same period in 2008. The basic and diluted loss per share from continuing operations declined $0.54 when compared to the basic and diluted loss per share from continuing operations of $1.66 for the first twelve months of 2008 on a pro forma basis.

117.    Asplund, commenting on the results, stated, in pertinent part, as follows:

2009 was a successful and a transitional year for Lime Energy … We grew revenues by 8.7% and increased gross profit by 1.3% over 2008 pro-forma results, strengthened our balance sheet and launched several exciting new growth initiatives, all in spite of a difficult economic environment.

118.    On March 23, 2010, Lime Energy filed its Annual Report on Form 10-K (the "2009 10-K") with the SEC for the 2009 fiscal year. The 2009 10-K was signed by Asplund and Mistarz, and reaffirmed the Company's financial results announced that same day. The 2009 10-K also contained Sarbanes-Oxley required certifications, signed by Asplund and Mistarz, substantially

48

similar to the certifications contained in Paragraph 79, *supra*.

119.    The 2009 10-K also stated that the Company's internal controls and disclosure procedures were effective through language substantially similar to Paragraphs 96 to 98, *supra*.

120.    The statements Asplund made at the Piper Jaffray Clean Technology & Renewables Conference, and the statements that Defendants made in the 2009 10-K as specified in Paragraphs 115 to 119 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

121.    On May 13, 2010 the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month Period Ended March 31, 2010." Therein, the Company, in relevant part, stated:

**Results for the three-month period ended March 31, 2010:**

- Revenue of $11.8 million, a $1.9 million or 13.9% decrease when compared to $13.7 million for the first quarter of 2009.

- Gross profit of $1.9 million, a $900,000 decrease from the $2.8 million earned during the first quarter of 2009.

- Gross profit margin of 15.7% as compared to 20.4% earned during the first quarter of 2009.

- Loss from continuing operations of $4.7 million, compared to a loss from

continuing operations of $3.2 million for the three-month period ended March 31, 2009.

- Net loss available to common stockholders of $4.7 million, an increase of $500,000 or 12.8% when compared to the $4.2 million loss for the first quarter of 2009.

- Adjusted EBITDA loss of $4.1 million, an increase of $2.4 million compared to the $1.7 million loss recorded for the first quarter of 2009.

- Basic and diluted loss per common share from continuing operations of $0.20 as compared to $0.34 per share for the first quarter of 2009.

- Basic and diluted loss per common share of $0.20 per share versus a loss of $0.38 per share for the first quarter of 2009.

122. Defendant Lime Energy, commenting on the results, stated, in pertinent part, as follows:

We remain optimistic on the growth opportunities in each of our markets and continue to expect our total revenue for 2010 to be between $95 million and $100 million with an adjusted EBITDA loss of between $3 million and $4 million. Our backlog remains at $94 million which is the largest and most diversified backlog in our history. We also continue to expect our revenue to be heavily weighted toward the third and fourth quarters due to the combination of the expected timing of public sector projects, the continuing ramp up of our utility program management business and the typical seasonal pattern of revenue for our C&I business. We therefore expect second quarter revenue to be between $16 million and $16.5 million.

123. On May 13, 2010, Lime Energy filed its Quarterly Report on Form 10-Q (the "Q1 2010 10-Q") with the SEC for the 2010 fiscal first quarter. The Q1 2010 10-Q was signed by Asplund and Mistarz, and reaffirmed the Company's financial results announced that same day. The Q1 2010 10-Q also contained Sarbanes-Oxley required certifications, signed by Asplund and Mistarz, substantially similar to the certifications contained in Paragraph 79, *supra*.

124. The Q1 2010 10-Q also stated that the Company's internal controls and disclosure procedures were effective as stated in similar to Paragraphs 80 to 81, *supra*.

125.   The statements Defendants made in the Q1 2010 10-Q as specified in Paragraphs 121 to 124 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

126.   On August 10, 2010, the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month and Six-Month Periods Ended June 30, 2010." Therein, the Company, in relevant part, stated:

**Results for the three-month period ended June 30, 2010:**

- Revenue of $17.5 million, a $1.7 million or 10.8% increase when compared to $15.8 million for the second quarter of 2009.

- Gross profit of $4.2 million, a $1.3 million increased from the $2.8 million earned during the second quarter of 2009.

- Gross profit margin of 23.9% as compared to 18.0% earned during the second quarter of 2009.

- Loss from continuing operations of $2.0 million, compared to a loss from continuing operations of $3.4 million for the three-month period ended June 30, 2009.

- Net loss available to common stockholders of $2.0 million, compared to a loss of $4.7 million for the second quarter of 2009.

- Adjusted EBITDA loss of $1.4 million, compared to the $2.1 million loss recorded for the second quarter of 2009[].

- Basic and diluted loss per common share from continuing operations of $0.09 as compared to $0.31 per share for the second quarter of 2009.

- Basic and diluted loss per common share of $0.09 per share versus a loss of $0.36 per share for the second quarter of 2009.

**Results for the six-month period ended June 30, 2010:**

- Revenue of $29.3 million, a $0.2 million or 0.7%, decrease from the $29.5 million earned during the first six months of 2009.

- Gross profit of $6.0 million, a $0.4 million or 7.1%, increase from $5.6 million earned during the first six months of 2009.

- Gross profit margin of 20.6% compared to 19.1% for the first half of 2009.

- Loss from continuing operations of $6.7 million, an increase of $91 thousand or 1.4% compared to a loss of $6.6 million for the year earlier period.

- Net loss available to commons stockholders of $6.7 million, a reduction of $2.2 million or 24.1%, compared to $8.9 million for the six-month period ended June 30, 2010.

- Adjusted EBITDA loss of $5.5 million, compared to the $3.8 million loss recorded for the six-month period ended June 30, 2009[].

- Basic and diluted loss per common share from continuing operations of $0.29 as compared to $0.71 per share for the six-month period ended June 30, 2009.

- Basic and diluted loss per common share of $0.29 per share versus a loss of $0.8per share for the six-month period ended June 30, 2009.

127. Defendant Lime Energy, commenting on the results, stated, in pertinent part, as follows:

We remain optimistic on the growth opportunities in each of our markets and continue to expect our total revenue for 2010 to be between $95 million and $100 million with an adjusted EBITDA loss of between $3 million and $4 million. Our backlog remains at $94 million which is the largest and most diversified backlog in our history. We also continue to expect our revenue to be heavily weighted toward the third and fourth quarters due to the combination of the expected timing of public sector projects, the continuing ramp up of our utility program management business and the typical seasonal pattern of revenue for our C&I business. We therefore expect second quarter revenue to be between $16 million and $16.5 million.

128. On August 10, 2010, Lime Energy filed its Quarterly Report on Form 10-Q (the "Q2 2010 10-Q") with the SEC for the 2010 fiscal second quarter. The Q-2 2010 10-Q was signed by Asplund and Mistarz, and reaffirmed the Company's financial results announced that same day. The Q2 2010 10-Q also contained Sarbanes-Oxley required certifications, signed by Asplund and Mistarz, substantially similar to the certifications contained in Paragraph 79, *supra*.

129. The Q2 2010 10-Q also stated that the Company's internal controls and disclosure procedures were effective through language substantially similar to Paragraphs 80 to 81, *supra*.

130. The statements Defendants made in the Q2 2010 10-Q as specified in Paragraphs 126 to 129 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

131. On November 8, 2010, the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month and Nine-Month Periods Ended September 30, 2010." Therein, the Company, in relevant part, stated:

**Results for the three-month period ended September 30, 2010:**

- Revenue of $28.1 million, a $7.1 million or 33.7% increase when compared to $21.0 million for the third quarter of 2009.

- Gross profit of $6.0 million, a $1.5 million or 33.4% increase from the $4.5

million earned during the third quarter of 2009.5

- Gross profit margin of 21.3%, unchanged from the 21.3% earned during the third quarter of 2009.

- Loss from continuing operations of $382 thousand, compared to a loss from continuing operations of $3.5 million for the three-month period ended September 30, 2009.

- Net loss available to common stockholders of $382 thousand, compared to a loss of $4.2 million for the third quarter of 2009.

- Adjusted EBITDA increased $892 thousand to $182 thousand, compared to a loss of $704 thousand for the third quarter of 2009[].

- Basic and diluted loss per common share from continuing operations of $0.02 as compared to $0.24 per share for the third quarter of 2009.

- Basic and diluted loss per common share of $0.02 per share versus a loss of $0.26 per share for the third quarter of 2009.

**Results for the nine-month period ended September 30, 2010:**

- Revenue of $57.4 million, a $6.9 million or 13.6%, increase from the $50.5 million earned during the first nine months of 2009.

- Gross profit of $12.0 million, a $1.9 million or 18.8%, increase from $10.1 million earned during the first nine months of 2009.

- Gross profit margin of 21.0% compared to 20.0% for the first nine months of 2009.

- Loss from continuing operations of $7.1 million, a decrease of $3.0 million or 29.8% compared to a loss of $10.1 million for the year earlier period.

- Net loss available to common stockholders of $7.1 million, a reduction of $5.9 million or 45.6%, compared to $13.1 million for the nine-month period ended September 30, 2010.

- Adjusted EBITDA loss of $5.3 million, compared to the $4.5 million loss recorded for the nine-month period ended September 30, 2009[].

- Basic and diluted loss per common share from continuing operations of $0.30 as compared to $0.87 per share for the nine-month period ended September 30, 2009.

- Basic and diluted loss per common share of $0.30 per share versus a loss of $0.98 per share for the nine-month period ended September 30, 2009.

132.    In the press release, Asplund stated that: "Our consolidated revenue for the third quarter of 2010 increased 33.7% when compared to the year earlier period demonstrating again the capability and increasing momentum of our diversified service platform[.]"

133.    Defendant Lime Energy, commenting on the results and the Company's outlook, stated, in pertinent part, as follows: "We continue to expect our total revenue for 2010 to be between $95 million and $100 million with an adjusted EBITDA loss of between $3 million and $4 million. Our current backlog is at $84 million."

134.    On November 8, 2010, Lime Energy filed its Quarterly Report on Form 10-Q (the "Q3 2010 10-Q") with the SEC for the 2010 fiscal third quarter.  The Q3 2010 10-Q was signed by Asplund and Mistarz, and reaffirmed the Company's financial results announced that same day.   The Q3 2010 10-Q also contained Sarbanes-Oxley required certifications, signed by Asplund and Mistarz, substantially similar to the certifications contained in Paragraph 79, *supra*.

135.    The Q3 2010 10-Q also stated that the Company's internal controls and disclosure procedures were effective through language substantially similar to Paragraphs 80 to 81, *supra*.

136.    The statements Defendants made in the Q3 2010 10-Q as specified in Paragraphs 131 to 135 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate

internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

137.    On March 10, 2011, the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month and Twelve-Month Periods Ended December 31, 2010." Therein, the Company, in relevant part, stated:

**Results for the three-month period ended December 31, 2010**

- Revenue increased $18.0 million or 89.0%, to $38.3 million during the three-month period ended December 31, 2010, from $20.3 million for the same period in 2009.

- Gross profit increased $5.6 million or 159.3%, to $9.0 million during the fourth quarter of 2010, when compared to the $3.5 million earned during the fourth quarter of 2009. The gross margin for the fourth quarter of 2010 was 23.6% compared to 17.2% for the fourth quarter of 2009.

- Selling, general and administrative expense decreased $0.3 million or 4.5%, to $7.1 million during the three-month period ended December 31, 2010 from $7.4 million for the same period in 2009.

- Income from continuing operations was $1.9 million for the fourth quarter of 2010, compared to a loss of $7.1 million for the fourth quarter of 2009.

- Net income was $1.9 million for the three-month period ended December 31, 2010, compared to a net loss of $6.5 million for three-month period ended December 31, 2009.

- The basic and diluted net income per share from continuing operations for the fourth quarter of 2010 was $0.08 per share compared to a net loss per share from continuing operations of $0.26 per share for the fourth quarter of 2009.

- Adjusted EBITDA[] was $2.3 million for the three-month period ended December 31, 2010, compared to an adjusted EBITDA loss of $3.4 million for the year earlier period.

**Results for the twelve-month period ended December 31, 2010**

- Revenue increased $24.9 million or 35.2%, to $95.7 million for the

twelve-month period ended December 31, 2010, when compared to $70.8 million for the twelve-month period ended December 31, 2009.

- Gross profit increased $7.5 million or 54.7%, to $21.1 million for the twelve months ended December 31, 2010, when compared to $13.6 million for the twelve months ended December 31, 2009. The gross margin was 22.0% for 2010 compared to 19.2% for 2009.

- Selling, General and Administrative expense increased $1.9 million or 8.1%, to $25.9 million for the twelve-month period ended December 31, 2010, when compared to $23.9 million for the same period in 2009.

- The loss from continuing operations declined $12.0 million or 69.7%, to $5.2 million in 2010, from $17.3 million in 2009.

- Net loss decreased $12.8 million or 70.9%, to $5.2 million during the twelve-month period ended December 31, 2010, when compared to the $18.0 million net loss for the same period in 2009.

- The basic and diluted loss per share from continuing operations declined $0.90 to a loss of $0.22 per share for 2010, compared to a loss of $1.12 per share for 2009.

- Adjusted EBITDA[] loss decreased $4.9 million, or 61.9%, to $3.0 for 2010, when compared to a loss of $7.8 million for 2009.

138.    Asplund and Lime Energy Co., commenting on the results, stated, in pertinent part, as follows:

The fourth quarter of 2010 highlights the 'Power of the Platform. It illustrates what we have been saying for a while, that the key to us generating sustained profitability is to deliver strong revenue growth, hold or improve our gross margins and control the growth of our SG&A …. Since re-making the company in 2006, we have grown revenue three times faster than SG&A with revenue having grown at a 104.3% compounded annual growth rate (CAGR) while SG&A increased at a 29.9% CAGR.

We currently expect our total revenue for 2011 to be between $122 million and $128 million with adjusted EBITDA of between $1.0 million and $2.0 million. We expect our first quarter revenue to be between $16.0 million and $17.5 million.

139.    On March 10, 2011, Lime Energy filed its Annual Report on Form 10 K (the "2010 10-K") with the SEC for the 2010 fiscal year.  The 2010 10 K was signed by Asplund and Mistarz, and

reaffirmed the Company's financial results announced that same day. The 2010 10-K also contained Sarbanes-Oxley required certifications, signed by Asplund and Mistarz, substantially similar to the certifications contained in Paragraph 79, supra.

140.    The 2010 10-K also stated that the Company's internal controls and disclosure procedures were effective through language substantially similar to Paragraphs 96 to 98, *supra*.

141.    The statements Defendants made in the 2010 10-K as specified in Paragraphs 137 to 140 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

142.    On May 12, 2011, the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month Period Ended March 31, 2011." Therein, the Company, in relevant part, stated:

**Results for the three-month period ended March 31, 2011:**

- Revenue increased $7.2 million, or 60.7%, to $19.0 million when compared to $11.8 million for the first quarter of 2010.

- Gross profit increased $1.8 million, or 94.3%, to $3.6 million from $1.9 million for the first quarter of 2010.

- Gross profit margin of 19.0% compared to 15.7% earned during the first quarter of 2010.

- SG&A expense increased $740 thousand, or 11.5%, to $7.2 million from $6.4 million during the first quarter of 2010.

- Operating loss declined $1 million, or 21.6% to $3.7 million from $4.7 million for the year earlier period.

- Adjusted EBITDA loss declined $1 million, or 24.6%, to $3.1 million from $4.1 million for the first quarter of 2010[].

- Basic and diluted loss per common share of $0.15 per share versus a loss of $0.20 per share for the first quarter of 2010.

143. Defendant Lime Energy, commenting on the results and the Company's outlook, stated, in pertinent part, as follows: "We expect to continue to experience higher revenue for the balance of the year, relative to 2010 levels. Our revenue is also expected to continue to be seasonal, with revenue continuing to build throughout the year. We currently have about $126 million in backlog, and expect our second quarter revenue to be between $24 million and $26 million."

144. On May 12, 2011, Lime Energy filed its Quarterly Report on Form 10-Q (the "Q1 2011 10-Q") with the SEC for the 2011 fiscal first quarter. The Q1 2011 10-Q was signed by Asplund and Mistarz, and reaffirmed the Company's financial results announced that same day. The Q1 2011 10-Q also contained Sarbanes-Oxley required certifications, signed by Asplund and Mistarz, substantially similar to the certifications contained in Paragraph 79, *supra*.

145. The Q1 2011 10-Q also stated that the Company's internal controls and disclosure procedures were effective through language substantially similar to Paragraphs 80 to 81, *supra*.

146. The statements Defendants made in the Q1 2011 10-Q as specified in Paragraphs 142 to 145 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results

59

were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

147.    On August 8, 2011, the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month and Six-Month Periods Ended June 30, 2011." Therein, the Company, in relevant part, stated:

**Results for the three-month period ended June 30, 2011:**

- Revenue increased $6.8 million, or 38.6%, to $24.3 million when compared to $17.5 million for the second quarter of 2010

- Gross profit increased $0.3 million, or 7.3%, to $4.5 million from $4.2 million for the second quarter of 2010.

- Gross profit margin of 18.5% compared to 23.9% earned during the second quarter of 2010.

- SG&A expense increased $0.7 million, or 11.5%, to $6.8 million from $6.1 million during the second quarter of 2010.

- Operating loss increased $1.5 million to $3.6 million from $2.1 million for the year earlier period. The second quarter of 2011 included a $1.1 million restructuring charge.

- The net loss increased $1.5 million to $3.5 million from $2.0 million for the three-month period ended June 30, 2010.

- Adjusted EBITDA loss increased $0.4 million to $1.8 million from $1.4 million for the second quarter of 2010[].

- Basic and diluted loss per common share of $0.15 per share versus a loss of $0.09 per share for the second quarter of 2010. The restructuring reserve contributed $0.05 per share to the loss during the first half of 2011.

**Results for the six-month period ended June 30, 2011:**

- Revenue increased $13.9 million, or 47.5%, to $43.2 million when compared to $29.3 million for the first half of 2010.

- Gross profit increased $2.1 million, or 34.1%, to $8.1 million from $6.0 million for the first half of 2010.

- Gross profit margin of 18.8% compared to 20.6% earned during the first half of 2010.

- SG&A expense increased $1.4 million, or 11.5%, to $14.0 million from $12.5 million during the first half of 2010.

- Operating loss increased $0.5 million to $7.3 million from $6.8 million for the year earlier period. The first half of 2011 included a $1.1 million restructuring charge.

- The net loss increased $0.5 million to $7.2 million from $6.7 million for the six-month period ended June 30, 2010.

- Adjusted EBITDA loss decreased $0.6 million to $4.9 million from $5.5 million for the first half of 2010[].

- Basic and diluted loss per common share of $0.30 per share versus a loss of $0.28 per share for the first half of 2010. The restructuring reserve contributed $0.05 per share to the loss during the first half of 2011.

148. Defendant Lime Energy, commenting on the results and the Company's outlook, stated, in pertinent part, as follows:

> We expect to continue to experience higher revenue for the balance of the year, relative to 2010 levels. Our revenue is also expected to continue to be seasonal, with revenue continuing to build throughout the year. We currently have about $190 million in backlog, and expect our third quarter revenue to be between $30 million and $35 million. Our backlog includes signed and awarded contracts, including multi-year contracts under utility programs.

149. On August 8, 2011, Lime Energy filed its Quarterly Report on Form 10-Q (the "Q2 2011 10-Q") with the SEC for the 2011 fiscal second quarter. The Q2 2011 10-Q was signed by Defendants O'Rourke and Mistarz, and reaffirmed the Company's financial results announced that same day.

The Q2 2011 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants

61

O'Rourke and Mistarz, substantially similar to the certifications contained in Paragraph 79, *supra*.

150.    The Q2 2011 10-Q also stated that the Company's internal controls and disclosure procedures were effective through language substantially similar to Paragraphs 80 to 81, *supra*.

151.    The statements Defendants made in the Q2 2011 10-Q as specified in Paragraphs 147 to 151 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

152.    November 8, 2011, the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month and Nine-Month Periods Ended September 30, 2011." Therein, the Company, in relevant part, stated:

**Results for the three-month period ended September 30, 2011:**

- Revenue increased $4.1 million, or 14.7%, to $32.2 million when compared to $28.1 million for the third quarter of 2010.

- Gross profit increased $1.1 million, or 18.0%, to $7.1 million from $6.0 million for the third quarter of 2010.

- Gross profit margin of 21.9% compared to 21.3% earned during the third quarter of 2010.

- SG&A expense increased $122 thousand, or 1.9%, to $6.4 million from $6.3 million during the third quarter of 2010.

- Operating income of $344 thousand as compared to an operating loss of $431 thousand for the third quarter of 2010. The 2011 third quarter results included a $172 thousand restructuring charge, $115 thousand of which was the loss on the sale of real estate.

- The net income of $359 thousand compared to a net loss of $382 thousand for the three-month period ended September 30, 2010.

- Adjusted EBITDA increased $1.1 million to $1.3 million when compared to $180 thousand for the third quarter of 2010[].

  Basic and diluted income per common share of $0.02 per share versus a loss of $0.02 per share for the third quarter of 2010.

**Results for the nine-month period ended September 30, 2011:**

- Revenue increased $18.0 million, or 31.4%%, to $75.4 million when compared to $57.4 million for the first nine months of 2010.

- Gross profit increased $3.1 million, or 26.1%, to $15.1 million from $12.0 million for the first nine months of 2010.

- Gross profit margin of 20.1% compared to 21.0% earned during the first nine months of 2010.

- SG&A expense increased $1.6 million, or 8.3%, to $20.4 million from $18.8 million during the first nine months of 2010.

-  Operating loss declined by $303 thousand to $6.9 million from $7.2 million for the nine-month period ended September 2010. The first nine months of 2011 included a $1.3 million restructuring charge.

- The net loss declined by $234 thousand to $6.9 million from $7.1 million for the nine-month period ended September 30, 2010.

- Adjusted EBITDA loss decreased by $1.7 million to $3.6 million from $7.1 million for the first nine months of 2010[].

- Basic and diluted loss per common share of $0.29 per share versus a loss of $0.30 per share for the first nine months of 2010. The restructuring reserve contributed $0.05 per share to the loss during the first nine months of 2011.

153.   Defendant Lime Energy, commenting on the results and the Company's outlook, stated, in pertinent part, as follows:

> We expect our fourth quarter to be a record quarter in terms of revenue and earnings, with revenue projected to be between $47 million and $53 million. We currently have about $227 million in backlog, of which approximately $80 million will be converted to revenue during 2012. Our backlog includes signed and awarded contracts, including multi-year contracts under utility programs and $31 million representing 20 years of revenue under contracts for the sale of output from our Zemel Road project.

154. On November 8, 2011, Lime Energy filed its Quarterly Report on Form 10-Q (the "Q3 2011 10-Q") with the SEC for the 2011 fiscal third quarter. The Q3 2011 10-Q was signed by Defendants O'Rourke and Mistarz, and reaffirmed the Company's financial results announced that same day. The Q3 201110-Q also contained Sarbanes-Oxley required certifications, signed by Defendants O'Rourke and Mistarz, substantially similar to the certifications contained in Paragraph 79, *supra*.

155. The Q3 2011 10-Q also stated that the Company's internal controls and disclosure procedures were effective through language substantially similar to Paragraphs 80 to 81, *supra*.

156. The statements Defendants made in the Q3 2011 10-Q as specified in Paragraphs 152 to 155 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

157. On March 8, 2012, the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month and Twelve-Month Periods Ended December 31, 2011." Therein, the

Company, in relevant part, stated:

### Results for the three-month period ended December 31, 2011

- Revenue increased $6.3 million, or 16.5%, to $44.7 million from $38.3 million for the fourth quarter of 2010.

- Gross profit increased $232 thousand, or 2.6%, to $9.3 million from $9.0 million earned during the fourth quarter of 2010.

- Selling, general & administrative expense increased $810 thousand, or 11.4%, to $7.9 million from $7.1 million in the year-earlier period.

- Operating income declined $6.5 million to a loss of $4.7 million from income $1.8 million in 2010. The 2011 fourth quarter included a $5.8 million impairment loss related to the write-down of the goodwill resulting from acquisitions associated with the C&I market.

- Net loss increased $6.6 million, to $4.7 million from net income of $1.9 million for the fourth quarter of 2010.

- Basic and diluted loss per common share of $0.20 per share versus income of $0.08 per share for the fourth quarter of 2010. The impairment loss contributed $0.25 per share to the basic and diluted loss per share during the fourth quarter of 2011.

- Adjusted EBITDA[] declined $156 thousand, or 6.7%, to $2.2 million from $2.3 million for the fourth quarter of 2010.

### Results for the twelve-month period ended December 31, 2011

- Revenue increased $24.4 million, or 25.5%, to $120.1 million from $95.7 million for 2010.

- Gross profit increased $3.4 million, or 16%, to $24.4 million, from $21.1 million in 2010.

158. Defendant O'Rourke and Lime Energy Co., commenting on the results, stated, in pertinent part, as follows: "Our businesses focused on the utility, public sector and federal markets performed very well during 2011, increasing their combined revenue by 42% and expanding their gross profit margins … we expect continued growth in revenue and profitability from our other businesses in

2012."

159.    On March 16, 2012, Lime Energy filed its Annual Report on Form 10-K (the "2011 10-K") with the SEC for the 2011 fiscal year.  The 2011 10-K was signed by Defendants O'Rourke and Mistarz, and reaffirmed the Company's financial results announced on March 8, 2012.  The 201110-K also contained Sarbanes-Oxley required certifications, signed by Defendants O'Rourke and Mistarz, substantially similar to the certifications contained in Paragraph 79, *supra*.

160.    The 2011 10-K also stated that the Company's internal controls and disclosure procedures were effective through language substantially similar to Paragraphs 96 to 98, *supra*.

161.    The statements Defendants made in the 2011 10-K as specified in Paragraphs 157 to 160 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

162.    On March 16, 2012, in an article published by ceocfos.com, Defendant O'Rourke touted the need to carry out its "strategic plan" to become profitable.  In pertinent part, O'Rourke stated:

**CEOCFO:** Mr. O'Rourke, you have been CEO for about a year and were COO before that; how, if in any way is Lime Energy changing under your leadership?
**Mr. O'Rourke:** Our vision and purpose has always been to build a clean energy future and that remains unchanged whether I am COO or CEO. As a leader in the company today, my responsibility is to execute our three-year strategic plan laid out in 2010 by the executive team and approved by our board.

**CEOCFO:** What is the Lime Energy strategic plan?

**Mr. O'Rourke: Our strategic plan, at least in the near term, is to continue to drive profitability for a company that has been unprofitable until now.** We intend to increase our profitability and revenue by focusing sharply on continuing to develop and expand our utility partnerships throughout the country, increasing our market share in the federal space and accelerating our product development activity. This will allow us to capitalize on the different emerging industry trends that are happening out there.

*                    *                    *

**CEOCFO:** What is the financial picture for Lime Energy today?

**Mr. O'Rourke:** Our financial outlook is very strong right now. We anticipate being profitable in 2012, and at the end of the last quarter we reported **a backlog of $226 million**, of which $80 million will convert to revenue in 2012, so we are anticipating continued strong year-over-year growth for the next few years organically without any acquisitions [emphasis added.]

163.    Indeed, just four days before, on March 12, 2012, Lime's investor-directed presentation materials for the 24th Annual ROTH conference also emphasized this purported "backlog":



164.    The statements Defendants made in the <u>ceocfos.com</u> article and at the 24th Annual ROTH conference as specified in Paragraphs 162 to 163 above were false and/or misleading and/or failed to

disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated, including the fictitious "backlog" it publicly touted; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

165.    On March 23, 2012, analysts continued to remain positive on the stock in an article published in the *Charlotte-Business Journal* by John Downey, entitled: "Analyst: Lime Energy in Solid Position, despite 4Q Loss." The article, in pertinent part, stated:

> Lime Energy Co. posted a net loss of $4.7 million in the fourth quarter of 2011. But analysts who follow the company say those results don't raise any red flags. "If you look, they are outperforming their peers," says Craig Irwin, who follows Lime at Wedbush Securities in Los Angeles. "The headline number is not always the number you want to look at to figure out how the company is performing."

Further, in discussing its utilities division, the writer called it "the Company's sweet spot, with Lime's utility-business revenue increasing nearly 42% in 2011 over 2010 levels."

166.    Further evidence that the Company's false statements caused analysts and the market to pump up the stock is the following article published by *Seeking Alpha* on April 8, 2012, in which hedge fund investment strategist Bret Jensen discloses that despite his previous skepticism regarding energy stocks, he had decided, for the first time, to purchase an energy stock (Lime) based on the Company's performance and expectations:

> I have never been a big fan of the alternative energy space for investing. First, the

68

government subsidies that keep the sector afloat runs counter to my fiscal conservative, small government ideology. It also always seems to create debacles as government is a terrible allocator of capital (see Solyndra). Finally, when government support is inevitably withdrawn the favored sector gets crushed.

\*        \*        \*

That being said, I am about to make my first investment in "clean" energy segment in a very long time as this stock's risk/reward profile is too good to pass up, in my opinion.

\*        \*        \*

7 reasons LIME is worth a flyer at under $3 a share:

1. It manufacturers no product. Instead it provides services and consulting to entities initiating "green" projects.

2. Its main customers (governments, utilities, etc…) provide stable sources of revenues. Sales are predicted to increase around 20% in both FY2012 and FY2013.

3. Insiders have been net buyers of the stock over the last eight months.

4. It finally turned operating cash flow positive in 4Q2011, it has net cash on the balance sheet and is priced at 58% of revenue.

5. Only two analysts cover the stock. One has a $7 price target and the other an $8 price target on LIME.

6. The company is poised to sharply accelerate EPS in the next two years. Although it lost 17 cents in FY2011, it is expected to make a 6 cent a profit in FY2012 and 21 cents a share in FY2013.

7. The stock has long term technical support at just under current prices …

167.    May 10, 2012, the Company issued a press release entitled, "Lime Energy Co. Reports Results for Three-Month Period Ended March 31, 2012."  Therein, while the Company reported minor losses in revenues for the three-month period ended March 31, 2012 (Revenue declined 3.5% or $659 thousand, to $18.3 million from $19.0 million for the first quarter of 2011), Defendant O'Rourke remained positive on the Company's outlook:

The first quarter results were in line with our expectations for what has traditionally

69

been our seasonally slowest quarter of the year … The quarter's results included a 16% year-over year increase in our core energy efficiency business, led by strong first quarter growth in our utility market segment… We are confident in our trajectory and expect a particularly strong second half as these utility programs ramp and further contribute to this year's expected results.

We expect our second quarter revenue projected to be between $24 million and $28 million. We currently have about $224 million in backlog, of which approximately $106 million is expected to convert to revenue during the balance of 2012. Our backlog includes signed and awarded contracts, including multi-year contracts under utility programs and power purchase agreements. We are reiterating our revenue guidance of $143 million for the year.

168.    On May 10, 2012, Lime Energy filed its Quarterly Report on Form 10-Q (the "Q1 2012 10-Q") with the SEC for the 2012 fiscal first quarter.  The Q1 2012 10-Q was signed by Defendants O'Rourke and Mistarz, and reaffirmed the Company's financial results announced that same day. The Q1 2012 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants O'Rourke and Mistarz, substantially similar to the certifications contained in Paragraph 79, *supra*.

169.    The Q1 2012 10-Q also stated that the Company's internal controls and disclosure procedures were effective through language substantially similar to Paragraphs 80 to 81, *supra*.

170.    The statements Defendants made in the Q1 2012 10-Q as specified in Paragraphs 167 to 169 above were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

171.     The statements made by Defendants and contained, *inter alia*, in Paragraphs 77 - 170, *supra* were false and/or misleading and/or failed to disclose: (1) that the Company was improperly recording revenue, including the creation of fictitious revenue and booking revenue in the wrong period for which it was earned; (2) that, as a result, the Company's revenue and financial results were overstated; (3) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and specifically violated FASB CON No. 5 through their misreporting of revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

172.     As a result of the foregoing, the Company materially misstated the Company's reported revenues and earnings.

173.     The Company has admitted that its accounting was improper and restated its financial statements between 2008 and the first quarter of 2012 to correct for material errors in revenue accounting.

**The Truth Begins to Emerge**

**The First Partial Disclosure**

174.     On July 17, 2012, before the market opened, the Company issued a press release entitled, "Lime Energy Announces Results of Preliminary Internal Review." Therein, the Company, in relevant part, stated:

> Lime Energy Co. (NASDAQ: LIME) today announced that on Sunday, July 15, 2012, the Audit Committee of the Board of Directors of Lime Energy Co. (the "Company") determined that the Company's consolidated financial statements on Form 10-K for the periods ended December 31, 2010 and December 31, 2011 and quarterly report on Form 10-Q for the period ended March 31, 2012 (the "affected financial statements") may no longer be relied upon. The Audit Committee made

that determination based on the results of a partial internal review conducted by the Company's management which was concluded on Friday, July 13, 2012.

Based on the results of that partial internal review, the Company's management and the Audit Committee believe that some portion of the Company's revenue was improperly recorded. **In some cases, it appears that non-existent revenue may have been recorded.** In other cases, it appears that revenue may have been recorded earlier than it should have been. The review did not turn up any indication of improper customer billing.

The Company cannot make a reliable estimate of the magnitude of the misreported revenue or the effects on the affected financial statements at this time; the Company does, however, currently believe that the cumulative adjustment to revenue for the affected financial statements will not exceed $15 million. The Company does expect that the misreporting may potentially require restatement of all of the affected financial statements.

The Company, under the supervision of the Audit Committee and with the assistance of outside counsel, is currently conducting an investigation of the misreporting.

The Audit Committee and Lime's principal financial and accounting officer have discussed the matters disclosed in this report with Lime's independent accountants, BDO USA, LLP [emphasis added].

175.    On the same day, Lime Energy filed a Current Report with the SEC on Form 8-K, entitled *Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review*, and reaffirming the admissions contained in the July 17, 2012 press release regarding the Company's finances.

176.    On this news, shares of the Company declined $0.91 per share, or 45%, to close on July 17, 2012, at $1.12 per share, on unusually heavy volume.

177.    Given the seriousness of the Company's revelations, a swift and severe market reaction was inevitable. As Garvin Jabusch, Cofounder and CIO of Green Alpha Advisors and manager of the Sierra Club Green Alpha Portfolio, explained in the immediate aftermath:

**The revelation that the company may have recorded "non-existent revenue" is a major concern**. Somewhat less concerning is "Revenue being reported earlier than it

72

should have been," which is a violation of the matching principle, and is a relatively easy mistake to make and can be readily forgiven if properly restated. **But the term "non-existent revenue" is a major red flag ... There are only a couple of reasons phantom revenue could get booked, and most firms have controls in place to make sure that sources of revenue are verified before they're booked. So at the very least, we can say that there are material weaknesses in LIME's internal controls.** At worst, some relatively senior person may have misinformed the accounting team [emphasis added].

178.    Analyst Craig Irwin at Wedbush Securities downgraded Lime to "neutral" from "outperform," and Phillip Shen of Roth Capital Partners noted: "We view today's news as a material negative and expect this overhang to persist until investor trust can be regained . . . . We are putting our rating, estimates and (price target) under review until further details emerge."

179.    On November 26, 2012, the Company issued a press release announcing that, on November 19, 2012, it had received a a second letter from the SEC indicating that the SEC had not received the Company's Form 10-Q for the period ending September 30, 2012 and that the Company remained delinquent in the filing of its Form 10-Q for the period ended June 30, 2102, and that, therefore, the Company did not comply with the Listing Rule for continued listing on NASDAQ.  The Company furthered stated that it expected to file the delinquent Forms 10-Q upon completion of the accounting review and the restatement of its previously issued financial statements expected to result from the review, but not later than February 11, 2013.

**The Second Partial Disclosure**

180.    On December 27, 2012, the Company issued a press release entitled, "Lime Energy Announces Expansion of Internal Review" containing fresh revelations that the Company had misreported revenue, extending all the way back to 2008-2009.  Therein, the Company, in relevant part, stated:

Lime Energy Co. (NASDAQ: LIME) today announced that on December 21, 2012,

73

the Audit Committee of the Board of Directors of Lime Energy Co. (the "Company") determined that the Company's consolidated financial statements on Form 10-K for the years ended December 31, 2008 and December 31, 2009 (the "2008 - 2009 financial statements") may no longer be relied upon. The Audit Committee made that determination based on information discovered in the course of the Company's internal investigation of the misreporting of revenue for the years ended December 31, 2010 and December 31, 2011 and the quarter ended March 31, 2012 (the "2010 - 2012 financial statements" and collectively with the 2008 - 2009 financial statements, the "affected financial statements") previously reported in the Current Report on Form 8-K filed on July 17, 2012. The Company's management and the Audit Committee believe that some portion of the Company's revenue for 2009 and 2008 was recognized earlier than permitted under generally accepted accounting principles. Nothing has come to the attention of the Company's management or the Audit Committee that would cause them to believe that any of the misreported revenue recorded for 2009 and 2008 should not have been recorded in a later period.

The Company cannot make a reliable estimate of the magnitude of the misreported revenue or the effects on the 2009 or 2008 financial statements at this time. The Company does expect that the misreporting will require restatement of the 2009 financial statements, in addition to the restatement of the 2010 - 2012 financial statements. The Company expects to promptly determine whether a restatement of the 2008 financial statement will be necessary. The Company also expects that it will be able to complete the restatement of the affected financial statements and disclose results from its internal investigation during the first quarter of 2013.

As previously disclosed, the Company, under the supervision of a subcommittee of the Audit Committee and with the assistance of outside counsel and forensic accountants, is currently conducting an investigation of the misreporting of revenue for 2010, 2011 and the first quarter of 2012. That investigation will be expanded to include the misreporting of revenue in 2009 and, if necessary, 2008.

Lime's principal financial and accounting officer has discussed the matters disclosed in this release with Lime's independent accountants, BDO USA, LLP.

181.    On this news, the stock swooned, closing at $0.56 per share. As *Seeking Alpha* put it immediately following the July 17, 2012 disclosure, "the downside risk that the accounting problems are pervasive, and the whole company is a Ponzi scheme" came to fruition and the stock dropped another 7%, a statistically significant decline.

182.    The stock has continually traded below $1.00 per share since the revelations.

183.    On December 31, 2012, John Downey published an article in the *Charlotte Business Journal* discussing the Company's internal investigation. The article states:

> Lime has little to say on the misreporting or the delisting issue beyond what is reported in its SEC filings and press releases. It refers reporters to NASDAQ delisting rules that note that a decision must be made at the latest with 360 days of the failure to report earnings. In Lime's case, that would put its latest possible date for a decision into June.
>
> NASDAQ currently lists Lime as delinquent for failing to publish its second quarter and third quarter reports and for its stock price falling below the $1 per share minimum set by the exchange. Lime has traded at less than a dollar a share since it disclosed its misreporting issues in Mid July. On Dec. 28, it closed at 56 cents a share.

184.    On January 14, 2013, Lime Energy issued a press release announcing that on January 9, 2013 it received a letter from The Nasdaq Stock Market LLC ("Nasdaq") regarding the Company's failure to comply with Nasdaq Listing Rule 5250(c)(1) because the Company had not filed its Quarterly Reports on Form 10-Q for the periods ended June 30, and September 30, 2012, and notifying the Company that trading of the Company's common stock would be subject to suspension and the Company's securities removed from listing and registration on the Nasdaq Stock Market on January 18, 2013.

## Defendants' Financial Manipulation of Lime's Reported Results

185.    The above-cited financial statements and the statements about the Company's financial results were false and misleading during the Class Period, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper recognition of revenue, in violation of GAAP rules, thereby materially overstating its revenue and assets and understating its losses.

186.    GAAP are those principles recognized by the accounting profession as the conventions, rules

and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

187. The full scope and extent of the fraud has not yet been revealed to investors. The Company stated that it will file its restatement by the end of the first quarter of 2013.

188. The fact that Lime Energy announced that its financial statements may need to be restated, and informed investors that these financial statements should not be relied upon is an admission that they were false and misleading when originally issued (APB No.20, 7-13; SFAS No. 154, 25).

189. Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a)    The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, 10);

(b)    The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, 34);

(c)    The principle that "financial reporting should provide information about the economic resources of an Lime Energy, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB

Statement of Concepts No. 1, 40);

(d)     The principle that "financial reporting should provide information about an Lime Energy's financial performance during a period" was violated (FASB Statement of Concepts No. 1, 42);

(e)     The principle that "financial reporting should provide information about how management of an Lime Energy has discharged its stewardship responsibility to owners (stockholders) for the use of Lime Energy resources entrusted to it" was violated (FASB Statement of Concepts No. 1, 50);

(f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, 58-59);

(g)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, 79); and

(h)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, 95).

190.    Throughout the Class Period, the Defendants orchestrated financial manipulations that were designed to, and did, misstate Lime's financial results.  As alleged in the following paragraphs, the Defendants had actual knowledge of the falsity of the statements they made, or acted in reckless disregard of the truth or falsity of those statements.  In doing so, Defendants committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Lime's stock during the Class Period.

191.    Defendants Mistarz and O'Rourke, along with Mr. Asplund were Lime's top finance and accounting executive officers, charged with ensuring the Company's financial results were fairly stated and complied with GAAP, and Lime's disclosed accounting policies.    Due to the circumstances described in this Complaint, Defendants Mistarz and O'Rourke, along with Mr. Asplund, knew, based on their conduct and readily-available accounting expertise, that their alleged Class Period misrepresentations were false or misleading and omitted material information.

192.    Between 2008-2012, Defendants regularly manipulated revenues to meet certain financial benchmarks in order to gain further investments from its largest shareholder.  During this time, Lime management conducted meetings and were provided with monthly financials. *See* ¶ above.

### Fraudulent Revenue Recognition

193.    From at least 2008 through 2012, the Defendants prematurely recognized revenue and created fictitious revenue.  Prior to and during the Class Period, the Defendants fraudulently recognized revenue, many on contracts related to its allegedly most profitable division, its utility division by deceptively abusing GAAP's revenue recognition standards.

194.    As a result of this improper revenue recognition, at least $15 million in revenue was improperly recorded during the 2010-2012 period, and additional material amounts for 2008-2009. Defendants knew, or were reckless in not knowing, that the making of such revenue entries had no accounting basis, violated GAAP, and was solely used meet certain financial benchmarks.

195.    Company finance personnel raised concerns about this practice on several occasions. *See* ¶¶ 60, 61-62 and 71-72 above.  In approximately 2011, for example, one confidential witness expressed her concerns to Defendant O'Rourke in person, telling O'Rourke that the Company's "underbilled is increasing because contracts are not matching up."  In another instance, problems with the utility

division's reported revenue were reported to Julie Chandler, Lime's Controller, and Jim Smith, Executive Vice President of Operations. Notwithstanding these challenges, no action was taken by management at the time to end this practice.

196.    Lime's quarterly and year-end financial results filed with the SEC and signed by Defendants Mistarz, Asplund and O'Rourke, represented that the accompanying financial statements included all adjustments necessary for fair presentation of Lime's results. These representations were false and misleading when made, as Lime's financial statements for these periods were not a fair presentation of Lime's results and were presented in violation of both GAAP and SEC rules.

197.    Creating fictitious revenue and recognizing revenue in periods where the contract was not complete on the percentage of completion methodology violates the most basic GAAP requirements. GAAP, as described by FASB Statement of Concepts No. 5 (FASB CON No. 5), provides the basic requirements for revenue to be recognizable: (i) revenue must have been earned; and (ii) revenue must be realizable (collectible). *See* FASB CON No. 5. Revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. *See* SFAS 48 ¶ 6.

198.    In addition, the SEC has issued Staff Accounting Bulletin No. 101, ("SAB 101"), *Revenue Recognition in Financial Statements,* which provides a summary of the SEC's views in applying generally accepted accounting principles, including SFAS 48 and FASB CON No. 5, to revenue recognition in financial statements. SAB 101 states that revenue is generally realized or realizable and earned when *all* of the following criteria are met:

> a. Persuasive evidence of an arrangement exists,
> b. Delivery has occurred or services have been rendered,
> c. The seller's price to the buyer is fixed or determinable, and

d. Collectability is reasonably assured.

199.     Along with FASB CON No. 5, the Company violated American Institute of Certified Public

Accountants ("AICPA") Accounting Research Bulletin (ARB) No. 45, Long-Term Construction-

Type Contracts  (which applies to almost all types of construction contracts including fixed-price or

lump sum, cost-type, time and material, and unit price contracts) and AICPA Statement of Position

("SOP") 81-1, Accounting for Performance of Construction-Type and Certain Production-Type

Contracts, which provides necessary guidance on applying GAAP not only for construction

contracts, but also for construction-like production activities.  ARB No. 45 and SOP 81-1 mandate

the use of either: (1) the *"percentage of completion"* method, under which the construction

contractor recognizes revenue over the life of the construction contract based on the degree of

completion: 50% completion means recognition of one-half of revenues, costs, and income; or (2)

the *"completed contract"* method, under which all revenues, costs, and income are recognized only

at completion of the construction project, ordinarily at the end of the construction contract.

200.     Finally, the Company's Audit Committee Charter itemizes the responsibilities of its

members, in relevant part, as follows:

> • Meet with the independent auditors and management of the Company at the
> conclusion of the audit to review the results of the audit, including any comments
> or recommendations of the independent auditors, especially the contents of any
> auditors' letter to management.
>
> • Review with the independent auditors and with the financial and accounting
> personnel the adequacy and effectiveness of the Company's internal controls and
> elicit any recommendations for improving the internal controls or particular areas
> where new or more detailed controls or procedures are desirable.
>
> • Inquire of management and the independent auditors regarding significant risks or
> exposures and assess the steps management has taken to minimize such risks and
> exposures to the Company.

• Review the financial statements contained in the annual report to shareholders with management and the independent auditors and, if appropriate, recommend to the board that such financial statements be adopted for inclusion in the Corporation's annual report to stockholders.

• Inquire of the independent auditors regarding their qualitative judgments about the appropriateness, not just the acceptability, of the accounting principles and the clarity of the financial disclosures. Also inquire of the auditors regarding their reasoning in accepting or questioning management's significant estimates, changes or proposed changes in accounting principles and disclosure practices management employs for new transactions or events. Resolve disagreements between management
and the independent auditors regarding financial statement disclosure.

• Investigate any matter brought to its attention within the scope of its duties, with the power to retain outside counsel for this purpose if, in its judgment, that is appropriate. The costs of such counsel will be paid by the Corporation.

• Verify that the Company's auditors have reviewed the Company's financial information prior to filing the Company's Form 10-Q Reports.

201.    Lime violated GAAP, SEC rules, and its own revenue recognition policy described in ¶ 46 above when recording revenue for fictitious clients and improperly recording revenue in the wrong period. Revenue clearly wasn't earned when it was created fictitiously and revenue was not realizable when revenue was booked in the wrong quarters for contracts that were not even executed. The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## **FIRST CLAIM**

### **Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

202.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

203.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which

81

was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Lime Energy's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

204.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Lime Energy's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

205.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Lime Energy's financial well-being and prospects, as specified herein.

206.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Lime Energy's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Lime Energy and its business operations and future prospects in light of

the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

207.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

208.     The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Lime Energy's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being,

and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

209.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Lime Energy's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Lime Energy's securities during the Class Period at artificially high prices and were damaged thereby.

210.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Lime Energy was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Lime Energy securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

211.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

212.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period upon the dissemination of the partial disclosures of July 16, 2012 and December 27, 2012.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

213.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

214.     The Individual Defendants acted as controlling persons of Lime Energy within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

215.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and

85

exercised the same.

216.    As set forth above, Lime Energy and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

January 18, 2013                                   Respectfully submitted,

                                                   **POMERANTZ GROSSMAN HUFFORD
                                                   DAHLSTROM & GROSS LLP**

                                                   /s/ *Louis C. Ludwig*
                                                   _____

Patrick V. Dahlstrom
Leigh Handelman Smollar
Louis C. Ludwig
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 377-1184
*Counsel for Lead Plaintiffs*

**GLANCY BINKOW & GOLDBERG
LLP**
Lionel Z. Glancy
Michael Goldberg
Robert V. Prongay
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Tel: (310) 201-9150
Fax: (310) 201-9160
*Counsel for Plaintiff Jeffrey Satterfield*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Lester R. Hooker
Brandon T. Grzandziel
2424 N. Federal Highway, Suite 257
Boca Raton, Florida 33431
Tel: (561) 394-3399
Fax: (561) 394-3082
*Counsel for Plaintiff James L. Clausen*

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**
Adam J. Levitt
Theodore B. Bell
55 West Monroe Street, Suite 1111
Chicago, Illinois 60603
Tel: (312) 984-0000
Fax: (312) 984-0001
*Counsel for Plaintiff Ray Galbraith*