# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JEFFREY SATTERFIELD, Individually and On Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>LIME ENERGY CO., JOHN O'ROURKE, DAVID R. ASPLUND, and JEFFREY MISTARZ, )<br><br>Defendants. ) | **Civil Action No. 12 C 05704 (SLE)**<br><br>Honorable Sara L. Ellis<br><br>**June 4, 2014 Hearing Date** |

## MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL
## OF THE PROPOSED SETTLEMENT AND PLAN OF ALLOCATION

**POMERANTZ LLP**
Patrick V. Dahlstrom
Leigh Handelman Smollar
Louis C. Ludwig
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Phone: (312) 377-1181
Fax: (312) 377-1184

*Counsel for Lead Plaintiffs and the Class*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................1

I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY ................... 3

    A. Gravamen of the Action................................................................. 3

    B. Commencement of the Action and Procedural History ............................. 3

    C. Investigation and Discovery ....................................................... 4

    D. Mediation ..................................................................................5

    E. The Settlement ..........................................................................6

II.  THE SETTLEMENT SHOULD BE APPROVED AS FAIR,
    REASONABLE AND ADEQUATE.................................................. 6

    A. The Standard for Court Approval of a Class Action Settlement ................ 6

    B. The Settlement is Presumptively Fair as it is the Product of
       Arm's Length Negotiations by Informed and Knowledgeable Counsel..... 7

    C. A Review of the *Armstrong* Factors Confirms That The
       Settlement is Fair, Adequate, and Reasonable........................................... 8

       1. Strength on the Merits Balanced on the Settlement Offer ...................8

       2. Defendants' Ability to Pay................................................. 10

       3. Likely Costs, Complexity, and Length of Further Litigation ............. 11

       4. Opposition to Settlement.................................................... 11

       5. Absence of Collusion........................................................ 12

       6. Opinion of Counsel ..........................................................13

       7. Stage of Proceedings and Amount of Discovery ................................ 14

III. THE COURT SHOULD APPROVE THE NOTICE .....................................14

IV.  THE PLAN OF ALLOCATION IS FAIR, ADEQUATE AND
    REASONABLE AND SHOULD BE APPROVED .......................................15

V.      THE ATTORNEYS' FEES, EXPENSES, AND A COMPENSATORY
        AWARD TO LEAD PLAINTIFFS AND MERIT APPROVAL ...................17

VI.     THE REQUIREMENTS FOR CLASS CERTIFICATION HAVE
        BEEN MET AND THE SETTLEMENT CLASS SHOULD BE
        CERTIFIED ...................................................................................................17

        A.  Numerosity ...................................................................................................18

        B.  Commonality ...............................................................................................18

        C.  Typicality ....................................................................................................19

        D.  Adequacy ....................................................................................................20

        E.  Common Questions Predominate ...............................................................20

        F.  Superiority of the Class Action ..................................................................21

CONCLUSION ........................................................................................................21

**CASES**

*Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997) ...............................................18, 20

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 CV 2898,
2012 WL 651727 (N.D. Ill. Feb. 28, 2012) ......................................................................7

*Armstrong v. Bd. of School Dir. of the City of Milwaukee*, 616 F.2d 305
(7th Cir. 1980) ...................................................................................................................7

*Boyd v. Coventry Health Care Inc.*, No. CIV.A. DKC 09-2661, 2014 WL 359567
(D. Md. Jan. 31, 2014) ....................................................................................................16

*Carnegie v. Household Int'l., Inc.*, 376 F.3d 656 (7th Cir. 2004) ...............................10, 21

*Clark v. Lomas & Nettleton Financial Corp.*, 79 F.R.D. 641
(N.D. Tex. 1978) ...............................................................................................................11

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir.),
*cert. denied,* 506 U.S. 953 (1992) ...................................................................................16

*Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113 (S.D.N.Y. 2001) ........................................18

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) ........................................................17

*E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985) ...........................8

*Ernst v. Hochfelder*, 425 U.S. 185 (1976) .......................................................................9

*Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers,
L.L.P.*, 212 F.R.D. 400 (E.D. Wis. 2002) ........................................................................16

*Hartman v. Wick*, 678 F. Supp. 312 (D.D.C. 1988)........................................................14

*Higginbotham v. Baxter Int'l, Inc.*, No. 04 C 4909, 2005 WL 1272271
(N.D. Ill. May 25, 2005) ..................................................................................................10

*Hispanics United of DuPage County v. Addison, Illinois*, 988 F. Supp. 1130
(N.D. Ill. 1997) .................................................................................................................10

*In re American Banknote Holographics*, 127 F. Supp. 2d 418
(S.D.N.Y. 2001) ...............................................................................................................16

*In re Datatec Sys., Inc. Sec. Litig.* No. 04-CV-525 (GEB), 2007 WL 4225828

(D.N.J. Nov. 28, 2007) ................................................................................................ 16

*In re Gen. Instrument Sec. Litig.*, 209 F. Supp. 2d 423 (E.D. Pa. Dec. 27, 2001) ........... 16

*In re Global Crossing Sec. & ERISA Litig*, 225 F.R.D. 436 (S.D.N.Y. 2004) ................ 16

*In re Groupon, Inc. Sec. Litig.*, No. 12 C 2450, 2012 WL 3779311
(N.D. Ill. Aug. 28, 2012) ............................................................................................. 13

*In re Initial Pub. Offering Secs. Litig*, 227 F.R.D. 65 (S.D.N.Y. 2004) .......................... 19

*In re Mexico Money Transfer Litig*, 164 F. Supp. 2d 1002 (N.D. Ill. 2001) ................... 11

*In re Northfield Labs, Inc. Sec. Litig.*, 267 F.R.D. 536 (N.D. Ill. 2010) .......................... 19

*In re Prudential Sec. Inc. Ltd. P'ships. Litig*, 163 F.R.D. 200 (S.D.N.Y. 1995) .............. 19

*In re Sumitomo Copper Litig*, 189 F.R.D. 274 (S.D.N.Y. 1999) ..................................... 11

*In re The Mills Corp. Sec. Litig.,* 265 F.R.D. 246 (E.D. Va. 2009) ................................. 16

*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124
(2d Cir. 2001) .................................................................................................... 16, 20

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996) ...................................................................... 6

*Keele v. Wexler*, 149 F.3d 589 (7th Cir. 1998) ................................................................ 18

*Kalnit v. Eichler*, 99 F. Supp. 2d 327 (S.D.N.Y. 2000)
*aff'd,* 264 F.3d 131 (2d Cir. 2001) ............................................................................... 9

*Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001) ......................................... 15

*Marisol A. by Forbes v. Giuliani*, 126 F.3d 372 (2d Cir. 1997) ................................ 18, 20

*McCabe v. Crawford & Co.*, 210 F.R.D. 631 (N.D. Ill. 2002) ......................................... 18

*Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950) ............................. 14

*Muro v. Target Corp.*, 580 F.3d 485 (7th Cir. 2009) ....................................................... 19

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ................................................... 15

*Pierce v. Atchison, Topeka and Santa Fe Ry.*, 65 F.3d 562 (7th Cir. 1995) ...................... 6

*Retsky Family Ltd. Partnership v. Price Waterhouse LLP*, No. 97 C 7694,

2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) ....................................................12

*Scholes v. Stone, McGuire & Benjamin*, 839 F. Supp. 1314 (N.D. Ill. 1993) ................... 7

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011).................................... 6

*Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193 (S.D.N.Y. 1992)................................. 19

*Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061 (5th Cir. 1994) ..................................... 9

*Varljen v. H.J. Meyers & Co., Inc.*, No. 97 CIV. 6742 (DLC), 2000 WL 1683656
(S.D.N.Y. Nov. 6, 2000)……………………………………………………………..19

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005) ............................. 7

## STATUTES

15 U.S.C. § 77z-1(b)(1) ...................................................................................... 8

15 U.S.C. § 78u-4(b)(2) .......................................................................................9

15 U.S.C. § 78u-4(b)(3)(B)................................................................................... 8

## RULES

Rule 23(b)(3).................................................................................................... 21

Fed. R. Civ. P. 23(e)(2)....................................................................................... 6

## OTHER

*Manual for Complex Litigation, Third,* § 30.42 (1995)...................................................... 7

Wendy Gerwick Couture, "Around the World of Securities Fraud in 80
Motions to Dismiss," Loyola University Chicago L.J., Vol. 45, p. 553 (2014) .............. 10

Class Actions - Certification Requirements Under Sec Rule 10b-5 –
Amgen Inc. v. Connecticut Retirement Plans & Trust Funds,
127 Harv. L. Rev. 268, 277 (2013) ..............................................................................10

7B Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 1797.6
(3d ed. 2005) ......................................................................................................14

ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS, § 8:04
(4th ed. updated June 2008) ...................................................................................15

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs Jamie Fang ("Fang") and Kevin J. Fetzer ("Fetzer") (collectively, the "Lead Plaintiffs"), respectfully submit this memorandum of law in support of their motion for final approval of the proposed settlement of this securities class action (the "Action"), as set forth in the Stipulation of Settlement ("Stipulation") dated January 21, 2014.[1]

## PRELIMINARY STATEMENT

After two years of litigation, Lead Counsel, through the active participation, oversight and approval of the Lead Plaintiffs, reached a Settlement in the amount of $2,500,000 to resolve the Class's claims against defendants Lime Energy Co. ("Lime" or the "Company"), John O'Rourke ("O'Rourke"), David R. Asplund ("Asplund"), and Jeffrey Mistarz ("Mistarz") (collectively "Defendants"). The strength of the Settlement is demonstrated by the fact that the $2.5 million recovery is approximately 30% of the recoverable damages as calculated by the parties and their damages experts.

Achieving this excellent result required Lead Plaintiffs and Lead Counsel to overcome significant risks in prosecuting the Action – and potentially collecting substantially less for the Class. In particular, the hurdles of pleading and proving causation for partial disclosures under the Private Securities Litigation Reform Act of 1995 (the "PSLRA") posed daunting challenges to Lead Plaintiffs and Lead Counsel when they undertook the prosecution of this Action. Even assuming Lead Plaintiffs were successful in defeating summary judgment, critical issues such as the senior management's *scienter*, loss causation for the partial statements, and the calculation of damages would be hotly contested at trial.

The merit of this Settlement is further supported by the fact that the Company's financial

---

[1] Unless otherwise defined herein, capitalized terms have the meaning ascribed to them in the Stipulation which was previously filed with the Court. (ECF No. 90).

condition hamstrung Lime's ability to pay a larger settlement. With the commencement of this Action, the Company's cash position fell dramatically, as did Lime's share price.

The Settlement was achieved only after Lead Counsel conducted extensive legal and factual investigations into the events and circumstances underlying the claims asserted in the Action; thoroughly researched the law pertinent to the claims against Defendants and potential defenses thereto; and consulted with experts. Thereafter, Lead Counsel conducted discovery by reviewing 47,000 documents produced by Defendants and interviewed Defendants Mistarz and O'Rourke, the Company's CFO and CEO, respectively. Thus, the Settlement was reached only after Lead Counsel and Lead Plaintiffs had attained a thorough understanding of the strengths and weaknesses of the claims against Defendants, which understanding was then verified by documentary review and the testimony of the two primary individual Defendants. Having done so, Lead Plaintiffs and Lead Counsel were in an optimal position to negotiate and evaluate the terms of the proposed Settlement.[2]

All of the foregoing demonstrates that the Settlement is eminently fair, adequate and reasonable, and should be approved.

The Plan of Allocation also is fair, adequate and reasonable, as it provides for equal *pro rata* treatment of Class member claims based upon when each member bought and held shares through the eight relevant disclosures, reflecting the amount of artificial inflation incorporated in Lime's share prices at various points during the Class Period. The plan provides recovery in proportion to the extent of Class members' alleged damages, and thus should be approved by the Court.

---

[2] A detailed description of Lead Counsel's efforts in prosecuting the Action is contained in the previously-filed *Declaration of Louis C. Ludwig, Esq. in Support Of Motion for Award of Attorneys' Fees and Expenses and Reimbursement Payment to Class Representatives* (ECF No. 105) ("Ludwig Dec.").

# I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

## A. Gravamen of the Action

This Action concerns alleged misrepresentations made by Defendants concerning the falsification of revenue and the dissemination of financial statements in violation of General Accepted Accounting Principles ("GAAP") during the Class Period. *See* Consolidated Amended Complaint (the "Amended Complaint") ¶¶ 4, 8, 10, 12-14, 41, 193-201. (ECF No. 44). Specifically, during the Class Period, Lime repeatedly represented to investors that "there were no changes in our internal control over financial reporting" that would "have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." *See, e.g.,* Amended Complaint, ¶ 98. In fact, however, the Company's financial statements and other representations during this period were riddled with fabrications and misinformation.

As a result of Defendants' misrepresentations and misleading financial statements, Lime's stock price was materially inflated throughout the Class Period. When the fraud was revealed in a series of partial disclosures, the price of Lime stock declined, causing losses to Class members who had purchased shares at inflated prices.

## B. Commencement of the Action and Procedural History

This is a securities fraud class action brought on behalf of all persons who purchased or otherwise acquired Lime securities during the Class Period (defined as the period between May 14, 2008 and December 27, 2012, both dates inclusive), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Lime and certain of its senior management. On July 17, 2012, Lime announced that investors could not rely upon the Company's financial statements for 2010, 2011, and the first quarter of 2012, admitting that non-existent revenue may have been booked and that revenue was recorded earlier than it should have been. Subsequently, five months later, in

December 2012, Lime announced that its financial statements going all the way back to 2008 could no longer be relied upon and a restatement would be necessary. These two disclosures caused the stock to tumble, falling over 50% of its pre-disclosure stock price.

Lead Counsel Pomerantz LLP ("Pomerantz") filed the initial complaint in the Action on July 20, 2012 (ECF No. 1). On October 26, 2012, the Court appointed then-movants Fang and Fetzer as Lead Plaintiffs and approved their selection of Pomerantz as Lead Counsel (*see* ECF No. 30). On December 27, 2012, Lime made the aforementioned announcement that the Company had misreported revenue extending back to 2008-2009. On this news, the stock dropped another 7%, closing at $0.56 per share. Class Plaintiffs filed the Amended Complaint on January 18, 2013. On May 15, 2013, Defendants moved to dismiss Class Plaintiffs' claims in their entirety. (*See* ECF No. 57). On July 22, 2013, Lead Plaintiffs filed their Opposition to Defendants' Motion to Dismiss. (*See* ECF No. 63).

On July 31, 2013, Defendants filed their restatement, admitting "that the utilities and public sector divisions did misreport revenue."[3] In light of the restatement, on September 26, 2013, Lead Plaintiffs filed a surreply in further opposition to Defendants' Motion to Dismiss (*see* ECF No. 72). Subsequently, on October 15, 2013, the Defendants filed a response to Lead Plaintiffs' surreply (*see* ECF No. 76). Defendants' Motion to Dismiss remains fully briefed.

### C. **Investigation and Discovery**

The Settlement was only entered into after Lead Counsel conducted an extensive investigation in connection with the filing of the Amended Complaint, including interviewing numerous former Lime employees throughout the United States, as well as other witnesses; conducting an additional investigation in light of further disclosures by the Company; reviewing

---

[3] Lime Energy Co. 2012 Form 10-K at 1 (July 31, 2013) publicly available online at:
http://www.sec.gov/Archives/edgar/data/1065860/000110465913058403/a13-17295_110k.htm

analyst reports and market watchers' reports and blogs; and thoroughly analyzing the Company's U.S. Securities and Exchange Commission ("SEC") filings during the Class Period.

As part of the mediation process, Lead Counsel requested discovery of documents from the Company and interviews with the Company personnel. Accordingly, Lead Counsel reviewed and analyzed over 47,000 documents responsive to such requests; conducted interviews of defendants O'Rourke and Mistarz; worked with accounting and damages experts concerning issues of materiality, *scienter*, causation, and the amount of damages sustained by the Class. *See* Ludwig Dec. at ¶¶ 10, 12.

### D. Mediation

Tentative settlement negotiations between Lead Plaintiff and Lime were initiated in early 2013, while the parties were engaged in briefing the motion to dismiss. After some preliminary discussions, Jed Melnick, Esq., an experienced mediator in securities litigation from the Judicial Arbitration and Mediation Services ("JAMS") was retained to serve as a mediator. The first mediation session in this Action was scheduled for August 7, 2013 at the JAMS offices in Chicago. Prior to the mediation, Lead Counsel and defense counsel exchanged settlement memoranda, setting forth the bases for their asserted claims and defenses and evidence in support of their respective positions. At the close of the initial lengthy mediation session, the parties were far apart many issues, but agreed to continue mediating via Mr. Melnick. *See* Ludwig Dec. at ¶ 10.

Prior to the next mediation session, Lead Counsel had discussions with Defendants' counsel, as well as Mr. Melnick. Negotiations continued throughout the months of August, September and October, 2013. On November 4, 2013, the parties had discussions with Mr. Melnick whereby the parties agreed to the mediator's proposal and the materials terms to the

settlement agreement.

E.    **The Settlement**

In consideration of the full settlement of all claims asserted in this Action, Lime and the Individual Defendants agreed to pay $2.5 million into the Lime Energy Securities Litigation Settlement Fund Escrow Account for the benefit of the Class.

In exchange for this consideration, Lead Plaintiff and the Class are releasing all claims against the Defendants and other related parties arising out of the facts alleged in the Amended Complaint. Class members still have until June 12, 2014 to submit claims, but as of the date of filing, 734 claims with recognized losses in an amount exceeding $1.9 million have been received by the Settlement Administrator. Lead Counsel will be prepared to apprise the Court of any updates to these figures at the Final Approval Hearing scheduled for June 4, 2014.

II.    **THE SETTLEMENT SHOULD BE APPROVED**
       **AS FAIR, REASONABLE AND ADEQUATE**

A.  **The Standard for Court Approval of a Class Action Settlement**

Settlement approval requires that the Court be satisfied that the parties' agreement is "fair, adequate and reasonable" to the class. Fed. R. Civ. P. 23(e)(2); *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("inquiry is limited" to these considerations). Courts have recognized that encouragement of voluntary settlements constitutes an important federal policy. *See Pierce v. Atchison, Topeka and Santa Fe Ry.*, 65 F.3d 562, 572 (7th Cir. 1995). This is especially true of class actions. *See Isby* at 1196 ("Federal courts naturally favor the settlement of class action litigation."); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 578 (N.D. Ill. 2011) (same).

The factors to be considered in approval of a class action settlement are: 1) the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement; (2) the defendant's ability to pay; (3) the complexity, length and expense of further litigation; (4) the

amount of opposition to the settlement; (5) the presence of collusion in reaching a settlement; (6) the reaction of members of the class to the settlement; (7) the opinion of competent counsel; and (8) the stage of the proceedings and the amount of discovery completed. *See Armstrong v. Bd. of School Dir. of the City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980), *accord Scholes v. Stone, McGuire & Benjamin*, 839 F. Supp. 1314, 1315 (N.D. Ill. 1993) (the "*Armstrong* factors"). Here, these factors show that the Settlement should be approved.

### B. The Settlement is Presumptively Fair as it is the Product of Arm's-Length Negotiations by Informed and Knowledgeable Counsel

There is a presumption of fairness for a settlement when it is the product of arm's-length negotiations conducted by experienced counsel who are fully familiar with all aspects of class action litigation. *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005)(citing *Manual for Complex Litigation, Third*, § 30.42 (1995)); *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 CV 2898, 2012 WL 651727, at *10 (N.D. Ill. Feb. 28, 2012) *appeal dismissed*, 710 F.3d 754 (7th Cir. 2013).

Here, the Settlement was reached by Lead Counsel, the Pomerantz Firm, one of the premier and oldest securities class action law firms in the country, and defense counsel from Sidley Austin LLP, one of the premier defense firms in America, after extended arm's-length negotiations, with the assistance of a nationally recognized mediator. Prior to and during the negotiations, both sides conducted extensive investigations and exchanged mediation reports that informed their knowledge of the strengths and weaknesses of each side.

Here, the lengthy and contentious negotiations evidence that the Settlement was the result of arm's-length negotiations by well-informed counsel, ably assisted by an experienced and well regarded mediatory, which establishes a presumption that the Settlement is fair, adequate and reasonable.

**C.     A Review of the *Armstrong* Factors Confirms That
        The Settlement is Fair, Adequate, and Reasonable**

**1.     Strength on the Merits Balanced on the Settlement Offer**

Generally, the most important factor in determining whether a settlement should be approved is the comparison of the strengths of plaintiffs' case versus the amount of the settlement offer.  *See E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).

Here, Lead Plaintiffs allege that during the Class Period, and in direct contravention of GAAP and Lime's own revenue recognition policies, Defendants manipulated the Company's revenues, all while keeping investors in the dark.  Due to the lack of internal controls and an unwillingness to admit that its strategic plan to increase profitability and revenues was failing, the Company misreported revenues and income by creating fictitious revenue and booking revenue in earlier quarters than it was earned in order to make the Company appear more profitable than it actually was.  The Company repeatedly represented to the market that revenues were expanding at a record pace.  *See* Amended Complaint, ¶¶ 5, 158, 206.

The PSLRA enjoins plaintiffs from conducting discovery during the pendency of a motion to dismiss, which was the status of the litigation here during settlement discussion.  *See* 15 U.S.C. § 77z-1(b)(1); 15 U.S.C. § 78u-4(b)(3)(B).  Nonetheless, Lead Counsel was able to substantiate the key allegations in the Complaint, including the allegations of willful conduct, by conducting an exhaustive investigation and prosecution, which included, *inter alia*, the examination of analyst reports and energy company analysts covering Lime throughout the Class Period; the examination of SEC filings made by Lime prior to and during the entire Class Period; and interview of numerous former Lime employees throughout the United States ("Confidential Witnesses").  *See* Amended Complaint, ¶¶ 51, 53-76.  Through this investigation, Lead Counsel were able to identify the location of the division within Lime where the accounting improprieties

primarily occurred, as well as the individuals who conducted the improper accounting.

For their part, Defendants cite to an independent investigation launched by the Company in wake of the July 17, 2012 disclosures that purportedly identified seven employees – who were subsequently discharged – as having participated in the misreporting of revenues including, Defendants claim, one of Lead Plaintiffs' key Confidential Witnesses. According to Defendants, the rogue employees went to great lengths to hide their activities, including falsifying documents for Lime's outside auditors, maintaining two sets of books, and instructing lower level employees not to provide information to the CFO. Defendants argue the investigation found no evidence that O'Rourke, Asplund, or Mistarz had knowledge of the wrongdoing before Mistarz himself uncovered accounting irregularities that led to the July and December 2012 disclosures. In examinations of Mistarz and O'Rourke conducted in connection with the Settlement, both Defendants claimed to have had no knowledge of the misreporting and fabrication of revenue at the time the alleged misstatements were disseminated into the market.

The PSLRA requires plaintiffs to plead facts giving rise to a "strong inference" that each of the Defendants made a specific statement with knowledge of its falsity. 15 U.S.C. § 78u-4(b)(2). *Scienter*, as applied to securities fraud claims, refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). "Scienter is a crucial element of [a] securities fraud claim[]… because not every misstatement or omission in a corporation's disclosures gives rise to a Rule 10b–5 claim." *See Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994); s*ee also Kalnit v. Eichler*, 99 F. Supp. 2d 327, 345 (S.D.N.Y. 2000) *aff'd,* 264 F.3d 131 (2d Cir. 2001) ("[t]he element of scienter is often the most difficult and controversial aspect of a securities fraud claim."). In order to establish corporate scienter for a company such as Lime, the "requisite scienter must be held by the

corporate employee responsible for issuing the alleged misrepresentations or at least that a senior officer or director of the corporation must have the pertinent scienter." *Higginbotham v. Baxter Int'l, Inc.*, No. 04 C 4909, 2005 WL 1272271, at *8 (N.D. Ill. May 25, 2005).

Recent academic research confirms that "[f]ailure to plead a strong inference of scienter, as required by the [PSLRA] is by far and away the most frequently successful ground for dismissal" of securities class actions.[4] Should Defendants prevail on their Motion to Dismiss[5] – which exclusively argues lack of *scienter* – the possibility of a class-wide recovery would be extremely remote. As in most such actions, the respective injuries suffered by Lime shareholders due to the stock price declines is not remediable via individual suits. *See Carnegie v. Household Int'l., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30"). In contrast to dealing with the uncertainties of litigation, the Settlement Fund stands to distribute approximately 30% of the total recoverable damages to Class members immediately. When weighed against the merits, the Settlement more than adequately compensates the Class.

### 2. Defendants' Ability to Pay

In the context of a class-wide settlement, courts typically consider the defendant's ability to pay. *See Hispanics United of DuPage County v. Addison, Illinois*, 988 F. Supp. 1130, 1150 (N.D. Ill. 1997). Upon the commencement of this Action, between year-end 2011 and the end of Q3 2012, the Company's cash position, based on filings with the SEC, fell from approximately

---

[4] *See* Wendy Gerwick Couture, "Around the World of Securities Fraud in 80 Motions to Dismiss," Loyola University Chicago L.J., Vol. 45, p. 553 (2014).

[5] Defendants' possible success at obtaining dismissal of the Amended Complaint is, at least statistically-speaking, not an unlikely outcome: "[o]f all the securities-fraud class actions filed since 2000, only 44.3% survived motions to dismiss …." *See* Class Actions - Certification Requirements Under Sec Rule 10b-5 - Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, 127 Harv. L. Rev. 268, 277 (2013).

$8.3 million to $1.7 million. Likewise, between the initial disclosure of Defendants' improprieties and the commencement of settlement negotiations in the Action, the price of Lime common stock did not climb any higher than $0.99 per share. Accordingly, Lime's ability to pay a meaningful settlement amount was reliant almost exclusively on its Directors & Officers Liability Insurance, which thereby capped the available funds for paying any settlement.

### 3. Likely Costs, Complexity, and Length of Further Litigation

Class actions, in general "have a well-deserved reputation as being most complex." *In re Sumitomo Copper Litig*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999). This is especially true in regard to securities class actions. *See Clark v. Lomas & Nettleton Financial Corp.*, 79 F.R.D. 641, 654 (N.D. Tex. 1978), *judgment vacated*, 625 F.2d 49, 30 Fed. R. Serv. 2d 144 (5th Cir. 1980) (noting that a securities case "by its very nature is a complex animal"). This case is no exception. Even assuming that Defendants' *scienter*-focused Motion to Dismiss would be denied, and subsequent appeal or motion for reconsideration denied, litigation of the class certification issue would require a significant commitment of time and financial resources, as well as an expensive and lengthy class discovery process. In addition to expensive and burdensome merits discovery, in the absence of settlement, a lengthy and expensive trial would be a virtual certainty. There is also the likelihood that post-trial appellate rights would be exercised here. The Settlement avoids the uncertainty, length of time, and high costs associated with continued litigation of the Action. The Court should finally approve the Settlement because it will entirely preempt these inevitable future litigation costs.

### 4. Opposition to Settlement

A low rate of opt-outs or opposition militates in favor of a settlement. *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020-21 (N.D. Ill. 2001) (high acceptance rate "is

strong circumstantial evidence in favor of the settlements"). Here, not a single Class member has filed an opposition to the Settlement. Indeed, no objections have been filed, and only one prospective Class members filed a request to opt-out of the Settlement after receiving the Class Notice. *See Affidavit of Daniel J. Polizzi Regarding (A) Mailing of the Notice and Proof of Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date*, May 27, 2014, ¶ 17 ("Polizzi Aff.") (<u>Exhibit 1</u>). The solitary request for exclusion[6] and lack of objections indicates the positive reaction of the members of the Class to the Settlement.

### 5.    Absence of Collusion

"Settlement negotiations that are conducted at arm's length and in good faith demonstrate that a settlement is not the product of collusion." *Retsky Family Ltd. Partnership v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, *2 (N.D. Ill. Dec. 10, 2001). The Settlement record proves that the Settlement is not the product of collusion. Lead Plaintiffs and the Settling Defendants reached this Agreement only after considering: (1) the benefits to the class; (2) the unfeasibility of individual judgments; (3) the evidence of liability in the case; and (4) the risks, costs, uncertainties, and delays of litigation.

The Settlement is the culmination of arms-length, good-faith negotiations on behalf of all parties to this Action. The Amended Complaint went through two filed iterations, Defendants filed a motion to dismiss, which went beyond normal briefing to encompass a sur-reply and sur-response. The Settlement terms were agreed upon only after arduous arm's-length bargaining by experienced counsel and mediation begun in August 2013 and overseen by Mr. Melnick, a

---

[6]  In addition, the single prospective Class member who chose to opt out of the Settlement held only a *de minimis* number of shares.

highly-experienced mediator.[7] Subsequently, over a period of several months, the parties exchanged multiple drafts of the Stipulation before they agreed upon the now-preliminarily approved terms of the Settlement.

## 6.    Opinion of Counsel

Lead Counsel believe this Settlement is fair, reasonable, and adequate.  As another court in this District has recognized, Pomerantz brings "extensive experience and expertise in the area of securities litigation and class actions … has successfully prosecuted numerous securities fraud actions on behalf of investors, and several courts have acknowledged the firm's ability to successfully litigate such cases."  *In re Groupon, Inc. Sec. Litig.*, No. 12 C 2450, 2012 WL 3779311, at *5 (N.D. Ill. Aug. 28, 2012) (approving selection of Pomerantz as Lead Counsel). Indeed, the Pomerantz firm has been litigating securities actions on behalf of shareholders for over 75 years, longer than any other firm in the United States.  With this extensive experience in securities litigation, the Pomerantz attorneys' opinion should be given great weight in assessing the myriad and complex issues involved in this case and the benefits to the Class in approving this Settlement.  Previously, the Pomerantz firm's resume was provided as an exhibit submitted in conjunction with Lead Plaintiffs' Motion for Award of Attorneys' Fees and Expenses and Incentive Payment to Class Representative.  (ECF No. 105-1).

---

[7] According to the JAMS website (http://www.jamsadr.com/melnick/), Mr. Melnick has been involved in the mediation and successful resolution of hundreds of complex disputes with an aggregate value in the billions of dollars. He has mediated over 750 disputes, published articles on mediation, founded a nationally ranked dispute resolution journal and taught young mediators.  Mr. Melnick is the managing partner for Weinstein Melnick LLC, working alongside the Hon. Daniel Weinstein (Ret.), one of the nation's preeminent mediators of complex civil disputes.  In 2010, 2011 and 2012, Mr. Melnick was selected as a *Pennsylvania Super Lawyers* "Rising Star," the only "Rising Star" in the Alternative Dispute Resolution category in Pennsylvania. He was also selected to the 2010 list of Pennsylvania "Lawyers on the Fast Track," a recognition given to 30 Pennsylvania Lawyers under the age of 40 by *Legal Intelligencer* and the *Pennsylvania Law Weekly*.

## 7. Stage of Proceedings and Amount of Discovery

The stage of proceedings and amount of discovery supports final approval. The members of the class have been identified. *See generally* Polizzi Aff., ¶¶ 4-7, 11 (Exhibit 1). The parties have compiled necessary discovery, and exchanged documents and data sufficient for Plaintiff and her attorneys to evaluate the strength of this case. To wit, Lead Counsel reviewed more than 47,000 documents produced by Defendants for discovery in connection with the Settlement that yielded information that, in Lead Counsel's estimation, establishes the requisite *scienter* that Lead Counsel would have needed to satisfy its burden to the jury. Lead Counsel subsequently examined Defendants Mistarz and O'Rourke regarding those documents, Lime's SEC filings, and the Amended Complaint's allegations in separate interviews that took place on April 2 and April 23, 2014, respectively. Lead Plaintiffs' collected efforts in prosecuting the Action are fully enumerated in the previously-filed Ludwig Dec. (*See* ECF No. 105, ¶ 10). At the time the Agreement was reached, Lead Plaintiffs were prepared to begin merits discovery and file a motion for class certification.

## III. THE COURT SHOULD APPROVE THE NOTICE

In compliance with the Preliminary Approval Order (ECF No. 98), Rust caused the approved class notice to be mailed to the Class members. Federal Rule 23 (e) (1) requires that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Notice to potential members of a plaintiff class must satisfy due process concerns. *See, e.g., Hartman v. Wick*, 678 F. Supp. 312, 331 (D.D.C. 1988) (citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950)). The Court has wide latitude in determining both the manner in which notice is given and the form that notice is to take. 7B Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 1797.6 (3d ed. 2005).

In order to protect the rights of absent Class members, the Court must provide the best notice practicable to Class members. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-812 (1985). Notice by first-class mail is practical when the names and addresses of most of the Class members are known. *See Manual for Complex Litigation* at § 30.2111. Notice should be mailed to the last known addresses of those who can be identified and publication used to notify others. ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS, § 8:04 (4th ed. updated June 2008) (citing *Manual for Complex Litigation* at § 30.211); *Mangone v. First USA Bank*, 206 F.R.D. 222, 231-232 (S.D. Ill. 2001) (approving mailed notice to last known addresses of a settlement class with nearly 18.5 million members)). Here, the Class members were ascertainable and notice was sent to them by first-class mail. *See* Polizzi Aff., ¶¶ 8, 12 (Exhibit 1).

Additionally, the content of the notice complied with Fed. R. Civ. P. 23 (c)(2)(B), which requires that notice "must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23 (c) (3)." Here, the content of the Class Notice stated all these things. (*See* ECF No. 90-1). In sum, the Notice meets the legal standards for appropriate notice and satisfies Rule 23. *Id.* Therefore, the Court should find that the Notice complied with both the Federal Rules of Civil Procedure and Due Process.

## IV. THE PLAN OF ALLOCATION IS FAIR, ADEQUATE AND REASONABLE AND SHOULD BE APPROVED

"'As a general rule, the adequacy of an allocation plan turns on . . . whether the proposed

apportionment is fair and reasonable' under the particular circumstances of the case." *In re Visa Check*, 297 F. Supp. 2d at 518-19 (citation omitted). "An allocation formula need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel." *In re American Banknote Holographics*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001); *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.,* 212 F.R.D. 400, 410 (E.D. Wis. 2002) ("A plan of allocation of settlement proceeds in a class action must also be fair and reasonable.") (citing *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1287–89 (9th Cir.), *cert. denied,* 506 U.S. 953 (1992)). "In evaluating a plan of allocation, the opinion of qualified counsel is entitled to significant respect. The proposed allocation need not meet standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis." *Boyd v. Coventry Health Care Inc.*, No. CIV.A. DKC 09-2661, 2014 WL 359567 (D. Md. Jan. 31, 2014); *In re The Mills Corp. Sec. Litig.,* 265 F.R.D. 246, 258 (E.D. Va. 2009) (citations omitted); *see also In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004); *In re Datatec Sys., Inc. Sec. Litig.*, No. 04-CV-525 (GEB), 2007 WL 4225828, at *5 (D.N.J. Nov. 28, 2007) (approving plan as "rational and consistent with Lead Plaintiff's theory of the case"). Because they tend to mirror the complaint's allegations, "plans that allocate money depending on the timing of purchases and sales of the securities at issue are common." *Id.*; *see also In re Gen. Instrument Sec. Litig.*, 209 F. Supp. 2d 423, 431 (E.D. Pa. Dec. 27, 2001) (deeming plan of allocation where "claimants are to be reimbursed on a *pro rata* basis for their recognized losses based largely on when they bought and sold their shares of General Instrument stock" as "even handed").

Here, the proposed Plan of Allocation is rational and consistent with Plaintiff's theory of

the case; the plan reimburses claimants largely based on when they bought or sold Lime common stock and the corresponding losses suffered by Class members for the entire Settlement Class Period. The Plan of Allocation provides *pro rata* payments to Class members based on when such members sold their Lime stock in relation to disclosures that corrected Defendants allegedly false and misleading statements. The Plan is designed to ensure that those Class members who purchased Lime common stock at artificially inflated prices, and then sold or held stock after a corrective disclosure occurred (*i.e.*, those Class members who could demonstrate loss causation) are the principal beneficiaries of the Settlement. By the same token, the Plan provides that any Class member who purchased shares that were sold prior to any corrective disclosure ("ins and outs") will receive nothing, since they would have been unable to establish loss causation. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005).

## V.  THE ATTORNEYS' FEES, EXPENSES, AND A COMPENSATORY AWARD TO LEAD PLAINTIFFS AND MERIT APPROVAL

Lead Plaintiffs have filed a separate motion (ECF Nos. 103-105), which fully explains the propriety of Lead Counsel's fee request, request for reimbursement of expenses, and request for compensatory awards to Lead Plaintiffs. For the reasons stated therein, Lead Counsel Requests that the Court approve (i) the request for attorneys' fees of $750,000, which represent 30% of the Settlement Fund, or a 1.16 multiplier based on Lead Counsel's lodestar of $646,609; (ii) the award of $41,409 in unreimbursed expenses incurred by Lead Counsel in connection with this Litigation; and (iii) the award of $1,000 each to Lead Plaintiffs. There have been no objections to the above fee request or the compensatory award to Lead Plaintiffs.

## VI.  THE REQUIREMENTS FOR CLASS CERTIFICATION HAVE BEEN MET AND THE SETTLEMENT CLASS SHOULD BE CERTIFIED

The parties stipulated to certification of the Class for settlement purposes as follows:

> All persons who purchased Lime Energy's securities between May 14, 2008 and December 27, 2012, both dates inclusive (the "Class Period"), who were damaged thereby (the "Class").

Excluded from the Class are Defendants, officers and directors of the Company at all relevant times, members of their families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

The ultimate decision regarding certification, however, rests with the Court. In its January 28, 2014 Order of Preliminary Approval, the Court conditionally certified the Class for purposes of settlement. (*See* ECF No. 98). Because all the requirements for class certification have been met, s*ee* Fed. R. Civ. P. 23(a), (b)(3), and in light of the substantial benefits the Settlement confers on the Class, Lead Plaintiffs respectfully request that the Court now grant this Action final class certification for the purposes of the Settlement. *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997) (settlement classes permissible).

## A. Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members would be impracticable. To date, the Settlement Administrator has mailed nearly 21,000 Notices to potential Class members. *See* Polizzi Aff. ¶ 12. Joinder of such a great number of persons would be exceedingly difficult and impracticable. And while, in this District, "there is no 'bright line' test for numerosity, a class of forty is generally sufficient." *McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002). Thus, Rule 23(a)(1) is easily satisfied.

## B. Commonality

Rule 23(a)(2) requires that the grievances of the named plaintiffs "'share a common question of law or of fact' with those of the proposed class." *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 122 (S.D.N.Y. 2001) (quoting *Marisol A. by Forbes v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)); *see also Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (commonality is

satisfied by showing "a common nucleus of operative fact."). Here, issues common to the Class include whether: (1) Defendants made material misrepresentations and omissions in Lime's SEC filings and press releases concerning recognized revenue and corresponding income; (2) defendants acted with the requisite *scienter*; (3) Lime stock was inflated by such misconduct during the Class Period; and (4) Class members suffered a loss when partial and more complete disclosures about the fraud were made. Accordingly, this case easily meets the second requirement of Fed. R. Civ. P. 23(a)(2). *See In re Initial Pub. Offering Secs. Litig.*, 227 F.R.D. 65, 87 (S.D.N.Y. 2004) ("in securities fraud litigation . . . where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied.").

### C. Typicality

Rule 23(a)(3)'s typicality requirement "directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009). The typicality requirement is liberally construed and does not require that the claims be identical. *In re Prudential Sec. Inc. Ltd. P'ships. Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y. 1995); *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 200 (S.D.N.Y. 1992). Here, the issue of whether Lead Plaintiffs sustained losses in Lime stock as a result of Defendants' alleged misconduct rises or falls on the same set of facts as those of other Class members: their claims are typical of the Class. Thus, the typicality requirement of Rule 23(a)(3) is satisfied. *See Varljen v. H.J. Meyers & Co., Inc.*, No. 97 CIV. 6742 (DLC), 2000 WL 1683656, at *3 (S.D.N.Y. Nov. 8, 2000) (finding the typicality requirement satisfied where "plaintiffs' claims stem from similar events and rely on similar legal arguments"); *Prudential Sec.*, 163 F.R.D. at 208 (finding that plaintiffs satisfied the typicality requirement where they alleged that defendants committed the same acts, in the same manner

against all class members).

### D. Adequacy

The typicality and adequacy requirements tend to merge, and they "serve as guideposts" for determining whether "the named plaintiff's claims and the class claims are so interrelated that the interests of the class will be fairly and adequately protected in their absence." *In re Northfield Labs., Inc. Sec. Litig.*, 267 F.R.D. 536, 541 (N.D. Ill. 2010) (quoting *Amchem Prods.*, 521 U.S. 591, 626 n.20). The adequacy requirement of Rule 23(a)(4) requires Lead Plaintiffs to demonstrate that: (1) there is no conflict of interest between Lead Plaintiffs and the other Class members; and (2) Plaintiffs' Lead Counsel are qualified, experienced, and capable of conducting the litigation. *Marisol A.*, 126 F.3d at 378. Both elements are satisfied in this case.

Lead Plaintiffs had a relatively large financial stakes in this litigation, expressed a desire to prosecute this Action, and actively monitored the litigation throughout. They retained counsel with extensive experience in the class action arena, who have vigorously and skillfully prosecuted the Action, securing a substantial recovery for the Class. Lead Plaintiffs, then, are adequate representatives of the Class, and their counsel are qualified, experienced, and capable of prosecuting this Action. Accordingly, the requirements of Rule 23(a)(4) have been met.

### E. Common Questions Predominate

To certify a class under Rule 23(b)(3), a court must find that the common issues of fact and law predominate over individual issues. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 132-33 (2d Cir. 2001), *cert. denied*, 536 U.S. 917 (2002). To satisfy this requirement, it must be shown that the issues subject to generalized proof predominate over the issues subject to only individualized proof. 280 F.3d at 136. "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem Prods.*, at 625. As discussed above, Lead Plaintiff alleges that Defendants engaged in a common course

of fraudulent conduct to artificially inflate the price of Lime stock. Because liability can be determined on a class-wide basis, and, therefore, issues common to the Class predominate over any individual issues, the predominance requirement of Rule 23(b)(3) is satisfied.

### F. Superiority of the Class Action

Rule 23(b)(3) also requires that the class action be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Here, the potential Class members number in the thousands, and are dispersed throughout the country. In addition, most of those injured have not been damaged to a degree where it would be cost-effective for them to seek recovery on their own. *Carnegie, supra,* 376 F.3d at 661. Accordingly, certification of the Class is appropriate.

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs Jamie Fang and Kevin J. Fetzer respectfully request that the Court approve the Settlement, Class Notice and Plan of Allocation, certify the Settlement Class, and enter the Order of Final Approval, which was attached as Exhibit B to Appendix 1 of the Settlement Agreement (ECF No. 91) and will be submitted electronically consistent with the Court's Case Management Procedures regarding Proposed Orders.

May 28, 2014

Respectfully submitted,

**POMERANTZ LLP**

/s/ *Leigh Handelman Smollar*

Patrick V. Dahlstrom
Leigh Handelman Smollar
Louis C. Ludwig
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 377-1184

*Counsel for Lead Plaintiffs and the Class*